[No. 16310. *En Banc.* May 28, 1921.]

HENRY CONGER, *as Receiver etc., Appellant,* v. PIERCE COUNTY *et al., Respondents.*[1]

NAVIGABLE WATERS (30-3)—RIPARIAN RIGHTS—INJURIES CAUSED BY STRUCTURES—EROSION. Laws 1913, p. 156, authorizing contiguous counties to cooperate in the improvement, confinement and protection of rivers and their banks, tributaries and outlets, the waters of which work damage by inundation or otherwise, has for its object the protection of adjoining lands from overflow, and does not contemplate the improvement of the stream for navigable purposes.

WATERS AND WATER COURSES (35, 72)—DIVERSION—FLOWAGE—ACTION FOR INJURIES. Where adjoining counties, under express legislative authority, improve a navigable stream for the purpose of preventing it from overflowing its banks and doing damage to public property, they are liable to a landowner, under Const., art. 1, § 16, prohibiting the damaging of private property for public use without compensation, if, because of such improvements and the manner in which they are made, his property is eroded and washed away.

[1]Reported in 198 Pac. 377.

CONSTITUTIONAL LAW (43, 51)—POLICE POWER—NATURE AND SCOPE —DEPRIVATION OF PROPERTY. The police power of the state, while permitting the regulation of private property even to its destruction, under the necessity of the public health, peace or welfare, does not extend to the taking of private property for public use without compensation to the owner.

WATERS AND WATER COURSES (44)—DAMAGES (9)—DIRECT OR CONSEQUENTIAL—IN GENERAL. The erosion and washing away of a property owner's land on the banks of a stream, due to deflecting the current of the stream by improvements in the channel made by defendants, cannot be said to be an indirect or consequential damage, where it appears that defendants through their engineer had knowledge that such an injury would probably result from the improvement.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for Pierce county, Clifford, J., entered April 28, 1920, granting a nonsuit and dismissing an action for damages caused by erosions due to certain river improvements. Reversed.

*Davis & Neal,* for appellant.

*J. W. Selden, John A. Sorley, F. D. Nash, Malcolm Douglas, Howard A. Hanson,* and *Bert C. Ross,* for respondents.

BRIDGES, J.—This is an action to recover damages caused by certain erosions, the result, it is alleged, of changes in and improvements of the Puyallup river, made by the defendants, which river, in part, forms the boundary line between the defendant counties and empties into Commencement Bay, at or near Tacoma. The complaint alleged, and the plaintiff's testimony tended to show, the following facts: On December 17, 1917, and for a number of years prior thereto, the Tacoma Meat Company, a corporation, owned a small tract of land bordering on the Puyallup river, near its mouth, on which land it had erected various buildings

in which it had carried on a general slaughtering and packing establishment. Within these buildings were considerable quantities of valuable machinery and other personal property. Prior to the making of the improvements hereinafter mentioned, the Puyallup river was a tortuous, navigable stream, which had been in the habit of overflowing its banks during the rainy seasons, and thus doing much damage to the bridges, roads and other public property of the defendants. In 1913, the legislature enacted a law which authorized any two counties, under certain circumstances, to jointly improve streams which flowed through both of such counties, or formed the boundary line between them, so as to correct, as far as might be, their habit of overflowing their banks and thereby causing damage. By virtue of this enactment, the defendants entered into a contract, under date of January 19, 1914, for the purpose of straightening and deepening the channel of the Puyallup river and abating the flood tendencies. This contract formed a district within which such improvements should be made, and the plaintiff's property is located in the extreme northwesterly portion of such district.

After entering into the contract, the counties proceeded to make the improvements and in many places they straightened the stream and widened and deepened it, and placed various improvements along and upon the banks with a view of keeping the waters from eroding them. A few hundred feet immediately above the plaintiff's property, the river, previous to its improvement, took a wide bend to the southwest, and as the waters so ran they were in the habit of hitting the northeasterly bank at a point slightly up stream from the plaintiff's property, which act caused the waters to be deflected in such a way that very little, if any,

erosion had occurred on the plaintiff's property in many years. In improving the stream, the defendants eliminated the bend just mentioned by causing the channel of the stream to be straightened, and, as a result of such straightening and the placing of concrete blocks on the banks for their protection, the waters of the stream were caused to come forcibly in contact with the bank on which plaintiff's property was situated, and during a high freshet in the winter of 1917, and after the defendants had completed their work of improving the river, there was such erosion of the plaintiff's lands as to cause its buildings to lose their foundations and to be floated, together with their contents, out into Commencement Bay, or Puget Sound. The particular causes of the erosions are alleged to be, the straightening of the channel in such manner as to throw the current of the stream against the river bank at the point of plaintiff's location; the placing of concrete protection on the bank opposite and a little above plaintiff's property in such way as to deflect the waters against the bank of the river where plaintiff's improvements were located, and the failure of the defendants to protect the banks along that part of the stream where plaintiff's property was situated.

When the plaintiff had rested its case, the trial court granted the defendants' motion to take the case from the jury and enter judgment dismissing the action. Later such judgment was made and entered and the plaintiff has appealed. Since there was sufficient testimony to carry the case to the jury on the theory that respondents' acts had caused the damages suffered by appellant, we will henceforth speak of the damage as being caused by respondents, realizing, of course, that, at best, it was a question for the jury.

The arguments before this court have taken such a wide and varied range that it seems necessary for us

at this time to show what the exact question before us is. In the first place, the appellant is not seeking any damage because its land and property were flooded. As a matter of fact, the waters, at the time in question, were so high as that all of plaintiff's property was flooded, but plaintiff seeks recovery only for damage done by erosion of his lands. In this way the direct question of damage by flooding is not involved. The testimony tends to show that the erosion was caused by such of the waters as were in the channel of the stream and that the overflow waters did not cause any erosion. Again, although this stream is navigable within the improved district, we have concluded that the law applicable to improving navigable steams in aid of navigation is not directly involved. While the improvements made by the respondents may or may not have improved the stream for navigation, the purpose of the improvement was not in aid of navigation, but to correct the tendency of the stream to overflow its banks. The legislative enactment authorizing the counties to do this work (Laws of 1913, p. 156) does not contemplate the improvement of the stream for the purpose of making it more navigable. Its title, which is as follows, quite correctly shows the purpose of the act:

"An act authorizing counties to contract together for administrative and financial cooperation in the improvement, confinement and protection of rivers and the banks, tributaries and outlets thereof, whose waters flowing into or through such counties work damage by inundation or otherwise, authorizing the levy of taxes and the creation and disbursement of special funds for such purposes, delegating the power of eminent domain in aid of, and providing generally ways and means for the accomplishment of such purposes and the performance of such contracts."

The direct question before us is, whether a county which straightens and otherwise improves a navigable

stream for the purpose of preventing it from overflow-
ing its banks and thereby doing damage to the public
property, where such improvements are made by vir-
tue of express authority of the legislature, is liable to
a landowner if, because of such improvements, and the
manner in which they are made, his property is eroded
and washed away. The trial court stated its position,
and as we understand it, that of the respondents, in
the following language:

"The Puyallup river, at the point in controversy, is
a navigable and tidal stream. The state in its sover-
eign right is owner of the bed and banks and body of
the stream, and as such owner may make such changes
in the course of the river, and may improve the same
by widening or deepening or straightening a channel,
or in any other manner it may see fit, and it is not liable
to the owner of the shore land for any damage that
may result from so doing, either directly or indirectly.
It owes no duty to the shore land owner to protect him
from resulting damage on account of any improvement
the state may make upon its own property in the banks
or bed of the stream, and the shore land owner has no
right to any protection from the result of the state's
acts in dealing with the river channel and the waters
flowing therein. . . ."

The parties to the action have elaborately discussed
the law of outlaw, or surface, waters. In our opinion,
those questions are not in this case, and to undertake
to discuss them would be to create confusion in a ques-
tion already sufficiently difficult. The appellant is
complaining only of the action of those portions of the
waters which were within the bed of the stream. It is
not complaining of any overflowed, outlaw or surface
waters. Certainly, so long as the waters are confined
to the bed and banks of the stream they cannot be out-
law waters.

It seems certain that had a private individual or private corporation caused the damage which the appellant alleges, there would be a liability. While a private individual has a right, under certain circumstances, to protect himself against overflow, surface and outlaw waters, he cannot so change the stream in an effort to protect his own property, as that he will thereby flood or erode the property of someone else. It seems to us that the authorities are quite unanimous in this regard. A few of them are as follows: *Judson v. Tidewater Lumber Co.,* 51 Wash. 164, 98 Pac. 377; *Johnson v. Irvine Lumber Co.,* 75 Wash. 539, 135 Pac. 217; *Valley Ry. Co. v. Franz,* 43 Ohio St. 623, 4 N. E. 88; *Crawford v. Rambo,* 44 Ohio 279, 7 N. E. 429; *Freeland v. Pennsylvania R. Co.,* 197 Pa. 529, 47 Atl. 745, 80 Am. St. 850, 58 L. R. A. 206; *Gerrish v. Clough,* 36 N. H. 519; *Bowers v. Mississippi & R. R. Boom Co.,* 78 Minn. 398, 81 N. W. 208, 79 Am. St. 395; *Morton v. Oregon Short Line Ry. Co.,* 48 Ore. 444, 87 Pac. 151, 120 Am. St. 827, 7 L. R. A. (N. S.) 344, and note; *Town of Jefferson v. Hicks,* 23 Okl. 684, 102 Pac. 79, 24 L. R. A. (N.S.) 214, and note.

But respondents contend that when they improved this river they were acting under direct legislative authority, and that what they did was for the state, and that when the state, either directly or through its appointed agents, acts for the good of the public, it cannot be made to respond for damages which may result to the private individual. They advocate the doctrine that the private individual, under such circumstances, must suffer for the public good. A wilderness of authorities are cited both in support of and against this proposition. It seems to us that a recurrence to certain fundamental principles may assist us in reaching a correct conclusion. One of the greatest contributions of the English speak-

ing people to civilization is the protection by law of the private individual in the enjoyment of his property and his personal liberties against the demands and aggressions of the public. No better illustration of the progressive growth of this principle can be found than that contained in our various state constitutions with reference to the taking of private property for a public use. It has been said that this power is a necessary incident to government and was before and did not grow out of constitutions. If so, the Federal constitutional provision, that private property should not be taken for a public use without compensation being made, was but a written expression of a right which already existed, being placed in the constitution for the purpose of emphasizing the desire to protect the rights of the individual. The national constitution and the constitutions of the earlier states went no farther than to provide that private property should not be taken for a public use without compensation being made. Later constitutions added to these provisions the idea that the compensation must be made before the taking is accomplished. Still later constitutions, including that of the state of Washington, added an additional element, to-wit, that private property may not be taken or damaged for the public use without compensation being first made. Const., art. 1, § 16. It is true that this is not an eminent domain proceeding but the principles of law involved in the power to take private property for a public use are involved here, because respondents are seeking to justify the damage alleged to have been done by them on the theory that they were acting by virtue of law and as an arm of the state, and for the use of the state, and for the public good.

Since, therefore, our constitution expressly forbids the taking or damaging of private property for a pub-

lic use except upon just compensation first made, on what theory can respondents be relieved from any damage to appellant's property as a direct result of the improvements which were made in the Puyallup river? Certainly not simply because they were acting as an arm of the state, or alone because they were acting for the good of the public, or simply on the theory that the individual must suffer for the public good. To hold that they would be relieved on any of these grounds would be entirely to disregard the express provisions of our constitution. The state itself cannot take or damage private property for a public use, without compensating the owner; nor can it authorize a taking or damaging which is prohibited to it. The only other principle of law under which respondents might be relieved would be the police power of the sovereign, because the only ways known to the law whereby private property may be taken or damaged by the public are by the principles of eminent domain or those of the police power. (If there may be a taking by taxation that principle does not interest us here). Indeed, it is the police power theory upon which respondents seem most strongly to rely. It is probable that this power is the most exalted attribute of government, and, like the power of eminent domain, it existed before and independently of constitutions. It is easy to understand the principles upon which the police power doctrine is based, but difficult to define in language its limitations. It is not inconsistent with nor antagonistic to the rules of law concerning the taking of private property for a public use. Because of its elasticity and the inability to define or fix its exact limitations, there is sometimes a natural tendency on the part of the courts to stretch this power in order to bridge over otherwise difficult situations, and for like reasons it is a power most

likely to be abused. It has been defined as an inherent power in the state which permits it to prevent all things harmful to the comfort, welfare and safety of society. It is based on necessity. It is exercised for the benefit of the public health, peace and welfare. Regulating and restricting the use of private property in the interest of the public is its chief business. It is the basis of the idea that the private individual must suffer without other compensation than the benefit to be received by the general public. It does not authorize the taking or damaging of private property in the sense used in the constitution with reference to taking such property for a public use. Eminent domain takes private property for a public use, while the police power regulates its use and enjoyment, or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public. Lewis, Eminent Domain, § 6, writes of this subject:

"Everyone is bound so to use his own property as not to interfere with the reasonable use and enjoyment by others of their property. For a violation of this duty the law provides a civil remedy. Besides this obligation, which every property owner is under to the owners of neighboring property, he is also bound so to use and enjoy his own as not to interfere with the general welfare of the community in which he lives. It is the enforcement of this last duty which pertains to the police power of the state so far as the exercise of that power affects private property. Whatever restraints the legislature imposes upon the use and enjoyment of property within the reason and principle of this duty, the owner must submit to, and for any inconvenience or loss which he sustains thereby, he is without remedy. It is a regulation, and not a taking, an exercise of police power, and not of eminent domain. But the moment the legislature passes beyond mere regulation, and attempts to deprive the individual of

his property, or of some substantial interest therein, under pretense of regulation, then the act becomes one of eminent domain, and is subject to the obligations and limitations which attend an exercise of that power."

In the case of *Askam v. King County*, 9 Wash. 1, 36 Pac. 1097, speaking of police power, this court said:

". . . while it is undoubtedly true that in extreme emergencies the rights of private parties as to property must yield to the requirements of the public, yet to authorize such interference the emergency must be such as to make the action necessary."

The specific question, then, is: were the respondents in the exercise of the police power in making the improvements they made in the river in question? Our answer must be in the negative. The legislative act under which they made the improvement is entirely bare of any expression which would indicate that the legislature considered that public necessity demanded or required the making of the improvement. Section 1 of the Laws of 1913, ch. 54, p. 156, being the act by virtue of which these improvements were made, provides that whenever any river shall flow in part through two counties, or shall form the boundary line between them:

". . . and the waters thereof have in the past been the cause of damage, by inundation or otherwise, to the roads, bridges or other public property situate in or to other public interests of both such counties, or the flow of such waters shall have alternated between the said counties so at one time or times such waters shall have caused damage to one county, and at another time or times to the other county, and it shall be deemed by the boards of county commissioners of both counties to be for the public interests of their respective counties that the flow of such waters be definitely confined to a particular channel, situate in whole or in part in either county. . . ."

then the counties interested may jointly make the desired improvement.

The act provides that the expense of making such improvement shall be raised by an annual tax on all the property in the county, which tax is to be levied and collected as any other county tax. The act nowhere intimates that the counties would be relieved from any damages that may be done to private property; on the contrary, they are authorized to exercise the power of eminent domain for the purpose of acquiring lands on which the river may be straightened. The contract between the respondents, under which the work was done, directly recognizes that the river in the past has overflown its banks and thereby damaged the roads, bridges and other private property of the two counties, and that because thereof litigation between them had arisen, and that the purpose of the contemplated improvement is to settle such pending litigation and make improbable future suits, and to avoid future damage to the roads and bridges of the two counties. It will thus be seen that this improvement was not made to preserve public health, peace, morals or welfare; it was not done to reclaim large tracts of land which otherwise might have been a waste; the idea of impelling necessity, which seems to be the chief ingredient of the police power, is entirely absent. Respondents cite many cases which they contend support them in their argument of non-liability. While we have carefully read all of them, we cannot here take the space to digest them, nor even cite all of them. The leading ones are: *Lamb v. Reclamation Dist.*, 73 Cal. 125, 14 Pac. 625, 2 Am. St. 775; *Cubbins v. Mississippi River Comm.*, 241 U. S. 351, 60 L. Ed. 1040; *Bass v. State*, 34 La. Ann. 494; *Hughes v. United States*, 230 U. S. 24; *McCoy v. Board of Directors*, 95 Ark. 345, 129 S. W. 1097, 29 L. R. A. (N. S.)

396; *Bedford v. United States,* 192 U. S. 217; *Gray v. Reclamation Dist.,* 174 Cal. 622, 163 Pac. 1024.

The decisions in some of these cases are based upon constitutional provisions which only prohibit the taking of private property without compensation, and are, therefore, at least to that extent, not in point in view of our constitutional provision. Others of the cases cited involve improvements made in aid of navigation and are not in point or material here. Others of the cited cases arise in instances where the state, or some subdivision of it, has made improvements in streams solely for the purpose of preventing them from overflowing their banks, and by such improvements reclaiming or saving to the state and its people large tracts of land, which are essential to the welfare of the public. Of this class, the case of *McCoy v. Board of Directors,* concerning the Arkansas river, and *Gray v. Reclamation District, supra,* concerning the Sacramento river, may be considered leading cases. The last cited case is particularly elaborately considered by the California supreme court. The reclamation district in that case built dikes, levees and other works purely for the purpose of confining the waters of the Sacramento river within its banks, in order to reclaim very extensive tracts of otherwise valueless lands. Because of such improvements, the plaintiff's lands were overflown and damaged. The court applied the police power to these facts and held the district was not liable. Without approving or disapproving the conclusion of the court in that case and in others along the same line, they are easily distinguishable from the case at bar. In those cases there are elements on which the police power is rightly based, but which facts are entirely absent from the case at bar. There the controlling purpose of the improvement was to reclaim and

save to the people large tracts of rich lands which, because of inundation, were worthless. To that extent the public welfare was involved. Here the controlling purpose was the protection of the roads and bridges of the respondent counties. Neither the state nor the people of the state or counties were interested in the improvement except in a very indirect way, and as tax-payers.

We are confident that any damage that may have been done by the respondents cannot be excused under any reasonable interpretation of the law of police power. While no cases exactly in point have been cited or found by us, the following are a few of a great number which, in principle, support our views: *Burrows v. Grays Harbor Boom Co.,* 44 Wash. 630, 87 Pac. 937; *Askam v. King County, supra; Ordway v. Village of Canisteo,* 21 N. Y. Supp. 835; *Noonan v. City of Albany,* 79 N. Y. 470, 35 Am. Rep. 540; *Bradbury v. Vandalia Levee and Drainage Dist.,* 236 Ill. 36, 86 N.E. 163, 19 L. R. A. (N. S.) 991; *Barden v. Portage,* 79 Wis. 126, 48 N. W. 210; *Jefferson v. Hicks,* 23 Okl. 684, 102 Pac. 79, 24 L. R. A. (N. S.) 214; Lewis, Eminent Domain, §§ 115, 285, 306.

In the case of *Burrows v. Grays Harbor Boom Co., supra,* the facts were: that the driving company had built several splash dams for the purpose of creating artificial freshets in order to assist in the driving of saw logs down the river towards market. The testimony showed that these artificial freshets caused Burrows' lands to be eroded. The latter by his action sought, among other things, to enjoin the creation of artificial freshets because of the damage they did to his lands. Substantially the same argument was made by the driving company in that case as is made by the respondents here. It was there contended that the

driving company was a quasi-public corporation,
directly authorized by legislative act, to create arti-
ficial freshets for the public good, and that it could
not be held liable for damages caused by them. This
court refused to adopt that view and held that if the
driving company caused Burrows' lands to be eroded
by its artificial freshets it would be liable therefor in
damages. Answering this argument, Judge Dunbar,
speaking for the court, said:

"This provision in the fundamental law (our con-
stitutional provision with reference to taking of pri-
vate property for public use) was construed by this
court in *Brown v. Seattle*, 5 Wash. 35, 31 Pac. 313, 32
Pac. 214, 18 L. R. A. 161, and in many subsequent
cases, to mean just what it said: and it can make no
possible difference whether the property abuts on a
street or river or whether the invader of that right is
a municipality, an individual, or a boom company; the
constitutional guaranty applies equally in both cases."

Why, indeed, on general principles, should not the
counties be liable if the damage to appellant is the
direct result of the changing of the river channel and
the currents of the stream? The counties were pro-
tecting themselves and their roads and bridges. May
they do this in such a way as to injure private property
without becoming liable therefor? Certainly not.
They are in no better position than would be an indi-
vidual who should do exactly the same thing. By the
legislative authority they had a right to straighten the
stream and change the currents thereof, but that legis-
lative authority did not absolve them from liability for
such damages as might directly result from such im-
provements.

But respondents contend that, in any event, they are
not liable here because the damage to appellant was
not the direct result of improvements made by them,

but was only what is sometimes termed indirect, or consequential, damages, for which there can be no liability. It is difficult to give any definition showing the difference between a direct and an indirect or consequential damage. This, however, may be easily shown by certain illustrations. Private property may be damaged and its value lessened because it is located close to some public building, such as a jail or hospital or public hall, yet such damage is purely incidental and not recoverable. The noise consequent on the operation of railroad trains upon private right-of-way, may depreciate the value of adjoining private property and be an annoyance to those living in the immediate neighborhood, but such damage is purely consequential and is not recoverable. But the injury to appellant's property, if caused as contended for by it, cannot be considered of this nature. The alleged erosion of its land and thereby the destruction of its property would be the direct result of the act of the respondents in straightening the channels of the river, and thereby changing the currents of the stream. There was testimony tending to show that respondents' engineers must of necessity have known that the improvements which they were making would cause the appellant's property to be eroded and probably washed away. Under these conditions it cannot be said that the damages are so remote and disconnected with the improvement of the river as to be purely incidental or consequential.

Briefly, we hold that if the damage in question was caused by the action of respondents in straightening the Puyallup river and thereby changing its currents, then the appellant is entitled to have its case submitted to a jury. It follows from what we have said that the trial court erred in taking the case from the jury. The

judgment dismissing the action is reversed and the cause remanded for trial.

PARKER, C. J., MACKINTOSH, FULLERTON, MAIN, TOLMAN, and MITCHELL, JJ., concur.

HOLCOMB, J. (dissenting)—The foregoing opinion is an exceedingly able and admirable one, but I am unable to bring myself to concur in it.

I agree with the conclusions of the trial judge quoted in the majority opinion. I am firmly of the opinion that the act under which the work was done by the counties was an act under the police power. The improvements were certainly for the public welfare. It is assuredly in the interests of public welfare to improve the stream so as to prevent flooding and destruction of county roads and bridges. If the safety of travel by the public is not the public welfare, it is difficult to conceive what would be.

It is determined that the Puyallup river is a navigable river. As such its sovereignty is in the state, the state having asserted absolute title and control of the beds, shores and banks of navigable rivers. It is determined that the work by the counties was lawfully performed, and the counties had previously obtained the necessary rights-of-way and made compensation for any damage by reason of such taking and change of the channel of the stream.

Therefore, the damage to appellant, if attributable to respondents, is consequent upon a lawful act of respondents, and is *damnum absque injuria*. Wiel (3d ed.), Water Rights, § 248; Dillon, Municipal Corporations (4th ed.), § 995; Cooley, Constitutional Limitations, p. 300; *Hill v. Newell*, 86 Wash. 227, 149 Pac. 951; *Morton v. Hines*, 112 Wash. 612, 192 Pac. 1016. Other authorities could be cited from our own and

other courts, but the above citations are sufficient to sustain my view. I therefore dissent.