[No. 18944. Department One. April 21, 1925.]

# Z. R. MAULSBY, *Appellant*, v. CALEB COOK *et al.*, *Respondents.*[1]

LOGS AND LOGGING (6, 9)—CONSTITUTIONAL LAW (51)—DRIVING AND FLOATING—USE OF SHORES—RECLAIMING STRANDED LOGS—DAMAGES—TAKING PROPERTY WITHOUT COMPENSATION. The owner of saw logs, cast upon riparian lands by a sudden freshet without fault on his part, has the right to enter upon the land and recover his property, and the incidental injury to the lands is not a taking or damaging of private property which is prohibited by Const., Art. 1, § 16, without just compensation having been first made.

REPLEVIN (2, 7)—PROPERTY SUBJECT—STRANDED LOGS—RIGHT TO POSSESSION. Replevin lies to recover saw logs cast upon riparian lands by a sudden freshet, where the riparian owner refuses consent to enter upon the lands.

Appeal from a judgment of the superior court for Snohomish county, Alston, J., entered May 24, 1924, upon findings in favor of the defendants, dismissing an action in replevin, tried to the court. Reversed.

*W. P. Bell* and *J. A. Coleman,* for appellant.

*E. W. Klein* and *Coleman & Fogarty,* for respondents.

TOLMAN, C. J.—This is an action in the nature of replevin to recover possession of certain saw logs which, by the flood waters of the Snohomish river, were cast upon respondents' land and there left stranded when the flood subsided. From a judgment denying relief, the plaintiff has appealed.

The facts, in the main, are stipulated, and there is no material controversy except as hereinafter noted. It appears that respondents are the owners of some eighty acres of low bottom lands bordering on the river, most of which has been cleared and put in culti-

[1]Reported in 235 Pac. 23.

vation, or used for pasture; that the river is a large, meandered, navigable stream and is subject to sudden freshets. A freshet occurred in the early part of February, 1924, during which the waters of the river rose, in less than two days, to such an extent that they overflowed the banks and all of the low lands of the respondents to a depth perhaps of some ten feet.

Previous to the occurrence of the freshet, the appellant and his assignors, who were engaged in logging on the river above respondents' premises, had there put sawlogs into the river and had left them to be floated down without attendance. The freshet referred to brought the logs down the river and over and upon respondents' low lands, where many of them became stranded in places where there was brush and small trees, and as the waters receded several hundred logs were left upon respondents' land, distant from the river from four hundred to a thousand feet, in positions where they could only be removed by a crew of men and a donkey engine or tractor, and it would require several days' time with such a crew and appliances to take them from the places where stranded and place them in the river. It appears that the logs could not be so removed without doing more or less incidental damage to the respondents' land, the amount of damage depending upon the care with which the operations might be conducted. Appellant had procured a large steel shoe, to be placed on the forward end of each log, to minimize the damage to respondents' land and facilitate the hauling of the logs to the river, and, provided with this equipment, he sought leave to remove the logs, which was denied him. The logs are of the admitted value of $2,000, respondents claim no right, title or interest in or to them, admit that they belong to the appellant, but refuse permission to the appellant to remove them, solely upon the ground that the damage

to their lands, which would be caused by such removal, must first be ascertained and paid to them before the right of removal can be exercised.

The evidence appears to establish with reasonable clearness that the logs could not have been removed by any known practical method before the waters subsided, and while the trial court found that the logs were deposited upon respondents' land by reason of a jam of logs which formed in the river near the upper end of respondents' premises, yet he did not find that the jam was permitted to remain an unreasonable length of time or that any care or precaution on the part of appellant and his assignors would have prevented the jam from forming, or could have prevented the logs from being cast upon the respondents' land.

As we read the evidence, the testimony as to the forming of the jam is rather vague and unsatisfactory. We are not satisfied that any jam was formed, or, if so, that that was the cause of the logs being cast upon the respondents' land, and since negligence is never presumed, we would not be justified in holding that there was any negligence on the part of the appellant or his assignors which was the proximate cause of the logs leaving the stream.

Respondents present two reasons why the judgment should be affirmed: (1) That replevin will not lie; and (2) that the owner of the logs may not enter their land, against their consent, for the purpose of removing the logs, until the damage to their. land, to be caused by such removal, has first been ascertained and paid. We will discuss these questions in inverse order.

(1) Respondents rely upon Art. I, § 16, of our state constitution, which, among other things, provides:

"No private property shall be taken or damaged for public or private use without just compensation having

been first made, or paid into court for the owner,
. . ."

and cite *Conger v. Pierce County,* 116 Wash. 27, 198
Pac. 377, 18 A. L. R. 393, and *Reed v. Seattle,* 124 Wash.
185, 213 Pac. 923; but we cannot think these cases are
in point.

Respondents' main reliance seems to be upon *Watkins v. Dorris,* 24 Wash. 636, 64 Pac. 840, 54 L. R. A.
199, and *Monroe Mill Co. v. Menzel,* 35 Wash. 487, 77
Pac. 813, 102 Am. St. 905, 70 L. R. A. 272. These cases
are largely devoted to a determination of the respective rights arising out of the floating of timber products
in streams which are navigable only for such purposes,
none of which questions are here involved, as the Snohomish river is admittedly a navigable stream for all
purposes, and the riparian owners have no interest in
the bed of the stream; but in the *Dorris* case it was
said:

"But neither such corporation nor individuals can
interfere with the soil in a stream of the character of
Elochoman creek, the bed of which is owned by the
land owner, without the land owner's consent, or, by
operation of law, with due compensation made. The
same reasoning applies with even greater force to the
use of the banks of the stream, as was sought to be
done in this case. *Lownsdale v. Grays Harbor Boom
Co.,* 21 Wash. 542, 547 (58 Pac. 663). Appellants,
therefore, have the right to drive their logs down the
stream as long as they do so without damage to the
land owner. But, if the use of the freehold or shore
rights are required, they must acquire them, either as
individuals, or by condemnation in a corporate capacity, as provided by the statutes above mentioned."

And in the *Menzel* case, that point was reinforced by
the following:

"Another provision of the decree, with reference to
the methods attending respondent's navigation, also
calls for examination. It will be remembered that, by

its terms, the decree prohibits appellant from interfering with respondent's employes in the way of preventing them from going upon the banks of the stream upon appellant's lands, for the purpose of breaking jams of shingle bolts, so long as the going upon the banks does no injury to appellant or his lands. We think this provision of the decree is also erroneous. We believe we went as far as we should go in the interest of public convenience, when we held, in *Watkins v. Dorris, supra,* that private land owners hold the beds of unmeandered streams subject to the easement of driving timber products over the land. But we tried to make it clear in that case that the timber driver must confine himself and his operations to the highway itself—the bed of the stream, until the land owner consents to the use of the banks, or until the right to their use has been acquired in a lawful way. If more emphatic statement of that rule is necessary, we now wish to be understood as making it, with all needed emphasis. The fundamental principle of right in the land owner to control his own premises, outside of the bed of the stream, must not be violated. To leave parties under such terms as this decree provides would, in many instances, invite trouble and litigation. Each one would assume to be his own judge as to whether any injury is done to the land. What might appear to the land owner as injury might not so appear to the timber driver, and thus a controversy would at once arise, probably requiring repeated litigation to settle. The driver must know from the beginning that he must, in no event, go upon the banks of the stream in his operations without the owner's permission, and thus controversies about damages accruing in that way will be avoided. Enough controversies will arise about the manner of operating in the bed of the stream to the possible damage of the adjacent land, without adding thereto those arising from semi-legalized trespass upon private premises, which would be the case if it were judicially held that one may operate upon private lands against the owner's consent, and without compensation.''

We think this language means only what it says, i. e., that the timber driver must confine his ordinary and usual operations to the highway itself, unless he acquires further rights in a lawful manner; and that it can have no application to the conditions present in the case now before us.

The law generally, with respect to the recovery of property cast upon the land of another by flood waters, seems to be well settled.

"The owner of personal property may recapture and take it into his own possession whenever and wherever he may peaceably do so, and in so doing he will not be guilty of trespass, even though he is compelled to enter on the land of another in order to enforce his right. This principle applies where one's property has been placed on the land of another, whether wrongfully or otherwise. Thus, where property is carried away by a flood and stranded on another's land, the owner may enter and take it away." 26 R. C. L., page 949.

And, also:

"But if the logs were cast upon the shore not by reason of an improper use of the stream, but by accident and without any fault of the defendants, they are not responsible at common law for the damage thus occasioned. Such streams, as well as our large rivers, will, as experience has universally shown, from their windings and the rush of their waters, especially in times of freshets, cast floating logs upon the shores and banks. And the right of the public and of the defendants to the use of this stream for the purpose of floating their logs, involves the right of going upon the land of riparian owners for the purpose of reclaiming the logs that may have been washed ashore. Such incidental necessity neither enlarges nor diminishes the natural capacity of the stream, in a legal sense, nor in any way affects its public character. This right of pursuit and reclamation rests upon the same natural right as that which permits the owner of cattle to pursue into an adjoining field and recover his beasts straying from the highway; but in the pursuit and recovery of his cattle

or his logs, the owner must do no unnecessary damage, and is responsible for any excess or abuse of his right. This right of reclaiming stranded logs is a common-law right, a natural right, incident to the right of navigation." (Citing a number of authorities) *Carter v. Thurston,* 58 N. H. 104, 42 Am. Rep. 584.

So, also:

"The only instance in which the common law recognizes the right of the public to enter upon the land of a riparian owner above high-water mark, in connection with the right of navigation, appears to be for the purpose of reclaiming stranded property which may have been washed ashore without fault on the part of its owner. In Maine the right to reclaim stranded logs is expressly recognized by a statute which requires payment or tender of compensation for damages. The common-law rule is that a person whose property is carried, by flood or inevitable accident, upon another's land, and who elects to reclaim and not abandon it, becomes responsible, immediately upon its removal, for the damage done by the property upon such land; and the law implies, in such a case, a promise of compensation, upon which, in the absence of an express promise, an action may be maintained. In case a bridge is carried away and the materials do injury upon another's land, the owner would doubtless be liable if the bridge was negligently constructed." Gould on Waters (2d ed.), § 102.

See, also: *Boutwell v. Champlain Realty Co.,* 89 Vt. 80, 94 Atl. 108, Ann. Cas. 1918A 726, and note following at page 734; *Forster v. Juniata Bridge Co.,* 16 Penn. St. 393, 55 Am. Dec. 506, and note following.

We hold, therefore, that, under the facts of this case, there can be no taking or damaging of private property in the constitutional sense, and that the owner may retake his property without the ascertainment of damages and compensation in advance.

(2) Where, as here, consent is denied, may the owner recover his property in an action in replevin?

Since his right to the possession of the property is clear, and that right is wrongfully denied him, we see no reason why replevin should not lie.

"A riparian owner has at common law no right or title to logs floated upon his lands by floods. So a person finding and taking possession of and selling a raft of timber stranded upon a sand bar in a navigable river is liable for conversion. And where lumber drifts down a stream and lodges upon adjacent land the owner may maintain replevin therefor." 17 R. C. L., page 1134.

The judgment appealed from is reversed, and the cause remanded with directions to enter judgment in favor of appellant for the possession of the logs, or if possession cannot be had, through fault of the respondents, then for the value thereof, together with costs of suit.

ASKREN, PARKER, MAIN, and BRIDGES, JJ., concur.