[No. 44630. En Banc. March 2, 1978.]

GEORGE C. RAINS, *Appellant,* v. THE DEPARTMENT OF
FISHERIES, ET AL, *Respondents.*

*Niichel & Rutz, P.S.,* by *Richard J. Niichel* and *John R. Rutz,* for appellant.

*Slade Gorton, Attorney General,* and *Earl R. McGimpsey, Assistant,* for respondents.

HICKS, J.—This case is certified to this court from the Court of Appeals, Division Two.

George C. Rains, appellant and plaintiff below, owns property in Clallam County through which flows Morse Creek, a nonnavigable fish–inhabited stream. He was denied a permit by the State to rechannel the bed of the creek. Thereafter the creek overflowed and damaged his property. Claiming the denial of the permit was the proximate cause of substantial damage to him, Rains brought an action against the State of Washington for negligence or, in the alternative, for inverse condemnation. The trial court granted the State a summary judgment on the negligence claim and dismissed the alternative cause for inverse condemnation on the grounds of failure to state a claim upon which relief can be granted. We affirm the trial court.

The stream bed of Morse Creek had moved over a period of several years and in its present channel the creek had started overflowing its banks during the late fall and winter. Rains conceived the idea of rechanneling the stream to its original bed where the creek crossed his property. His purpose was to prevent flood and erosion damage to his land.

On August 2, 1972, Rains applied to the Department of Fisheries and to the Department of Game (departments) for a hydraulic permit, as required by RCW 75.20.100, to "remove whole trees from creek bed, cut through 3 gravel bars that built up in last winter's flood and replace gravel

to its former location & stream to its former location." Rains wished to do this work between August 15 and 17. On August 30, the departments issued a modified permit for the proposed work, but the request to realign the stream channel was denied.

Rains did the work that was authorized. He obtained a time extension on September 19 which permitted him until September 30 to complete the work. In the course of discussion with representatives of the departments, Rains was told that it was highly unlikely he would ever be allowed to realign the channel of the stream bed because of the probable harm to fish life, despite the potential of flooding to his property. When the request to return the stream to its former location was denied and he was informed it was unlikely that he would ever get a permit to rechannel Morse Creek, Rains did not demand a hearing as he could have done under RCW 34.04.090, the state's administrative procedures act (APA). That was an unfortunate omission in this case.

Morse Creek overflowed its banks in December 1972, causing extensive flood and erosion damage to Rains' property. This action for negligence or, in the alternative, for inverse condemnation followed. The creek again overflowed in January 1974, for which a further claim of damage is made.

Rains contends the summary judgment in the negligence claim was improper because there were material facts at issue. One such "fact" was the futility of pursuing administratively an appeal of the denial to rechannel Morse Creek. Another such "fact" was the insufficiency of time to complete an appeal before the impending chum salmon run, upon which the permit denial was based. Thus, it was impossible to follow the administrative hearing procedure.

According to Rains, these "facts," when viewed in a light most favorable to him as they must be in a CR 56 proceeding, make entry of the summary judgment in favor of respondent erroneous. Ordinarily, he would be correct.

Rains cites and relies on RCW 4.92.090:

> The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.

This statute, so clear on its face, is not as broad as it might seem. *See Evangelical United Brethren Church v. State,* 67 Wn.2d 246, 407 P.2d 440 (1965). In *Evangelical,* we held that the above statute did not bring within its reach all acts and omissions of government on the theory of continuing immunity for the truly discretionary acts of state officials, but liability was authorized under the statute for other executive and administrative processes sometimes characterized as "ministerial" conduct.

In this instance we do not find it necessary to categorize the state's action, for we do not reach *Evangelical.* Rather, we resolve this case by viewing the APA (RCW 34.04) procedures for hearing together with RCW 4.92.090 (allowing the State to be sued in tort) and we find no inconsistency in requiring a "second look", in fact, there is an apparent legislative intent to provide under RCW 34.04-.090 such a "second look" before *any* action (direct review, or, as here, an action for damages) will be sanctioned in the courts. Therefore, we hold it to be the policy of this State that the administrative procedures for a hearing must be invoked or attempted to be invoked before liability in tort may be charged to the State for failure to issue a license or permit. There is no sound reason to permit one who may suffer damage from a possible erroneous initial administrative decision regarding a license or permit to sit back and wait until after damage has occurred and then bring an action. If utilized, RCW 34.04.090 could well eliminate erroneous decisions in many instances by its "second look" which will normally involve officials higher in the chain of command than those who made the initial decision. The question of when legal liability attaches to one's acts is a policy question.

"[Legal liability] is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy, and precedent. . . .

*King v. Seattle,* 84 Wn.2d 239, 250, 525 P.2d 228 (1974). *See also* W. Prosser, *Torts* § 42, at 244 (4th ed. 1971).

We find the rationale for such a policy determination in the fact that the legislature set up the procedure between agencies and applicants. Such legislative scheme for an administrative hearing implies that any other remedy is precluded, absent such hearing, and further it can be said there was no final determination made by the departments. Consequently, no liability will attach.

██ The trial court based its decision on (1) failure to exhaust administrative remedies, (2) collateral estoppel, and (3) failure to avoid or mitigate damages. However, since we are affirming on the basis of policy, we do not find it necessary to discuss the trial court's grounds for its decision. Even if our decision is not based on all theories advanced by the trial court, the law is well settled that a reviewing court may affirm on any proper theory whether or not considered by the trial court in reaching its conclusion. *Cheney v. Mountlake Terrace,* 87 Wn.2d 338, 552 P.2d 184 (1976).

In this case, we do not wish to be understood as holding more than that utilization of RCW 34.04.090 is a threshold step which must first be taken. Thereafter, the tests of *Evangelical* must be met in order to come within RCW 4.92.090. In this instance, the threshold step was not taken.

The trial court was correct in its ruling on the issue of negligence.

We turn to the contention of a taking or damaging of appellant's property for public use (inverse condemnation). If there was such a taking or damaging by the State, compensation must be paid. Const. art. 1, § 16 provides:

No private property shall be taken or damaged for public or private use without just compensation having been first made . . .

The critical determination under this constitutional provision is between a "taking" and a regulation or restriction on the use of private property in the public interest, which is deemed to be a valid exercise of the police power of the State for which there is no right to compensation. It is clear that protection of fish life is a legitimate state interest and fish and game regulations have been a valid exercise of the police power ever since territorial days. *Hayes v. Territory,* 2 Wash. Terr. 286, 5 P. 927 (1884). But appellant asserts that the departments' denial of the rechanneling permit was not simply regulatory but amounts to a taking of his property, and that as such he is entitled to compensation. He cites *Conger v. Pierce County,* 116 Wash. 27, 198 P. 377, 18 A.L.R. 393 (1921), to support his position.

Discussing police power, we said in *Conger* at pages 35–36:

It is easy to understand the principles upon which the police power doctrine is based, but difficult to define in language its limitations. . . . Eminent domain takes private property for a public use, while the police power regulates its use and enjoyment, or if it takes or damages it, it is not a taking or damaging for the public use, but to conserve the safety, morals, health and general welfare of the public.

In *Conger,* the plaintiff was allowed to recover for damage to his land resulting from a governmental undertaking to straighten the Puyallup River. In doing the work, the course of the river's current was changed and it eroded the plaintiff's property. There, as in all cases that we have examined which found a taking or damaging amounting to inverse condemnation, affirmative action on the part of the government was involved. Such affirmative action was absent in this case. *See Damage to private property caused by negligence of governmental agents as "taking," "damages" or "use" for public purposes, in constitutional sense,* Annot., 2 A.L.R.2d 677 (1948).

We recently had occasion to consider *Conger,* and the issue of "public taking" in *Maple Leaf Investors, Inc. v.*

*State,* 88 Wn.2d 726, 565 P.2d 1162 (1977). In *Maple Leaf,* as in the instant case, the State relied upon police power as authority for its conduct. The issue concerned a floodway across a portion of plaintiff's land and the strict regulation of building within the floodway. The instant case concerns regulating appellant's action regarding a stream that flows across his property. We said in *Maple Leaf* at page 733:

> The establishment of a flood control zone and the enactment of regulations restricting development within the floodway is not a public improvement in the usual sense of the term. *Cf. Conger v. Pierce County, supra.* The State does not propose to build any facilities or to take any action which would increase the flow of water over appellant's property or flood its land. *See Turner v. County of Del Norte,* 24 Cal. App. 3d 311, 101 Cal. Rptr. 93 (1972). The State acquires no property interest in appellant's land nor is it being set aside for a public use. Comment, *Distinguishing Eminent Domain From Police Power and Tort,* 38 Wash. L. Rev. 607 (1963). . . .
>
> There is no governmental enterprise, the value of which is enhanced by the State's action. *See, e.g., Anderson v. Port of Seattle,* 49 Wn.2d 528, 304 P.2d 705 (1956). There is no physical invasion of appellant's property. *See, e.g., Keesling v. Seattle,* 52 Wn.2d 247, 324 P.2d 806 (1958). The restrictions imposed on appellant's land use do not discriminate, but treat all similar property owners equally. *Cf. Smith v. Skagit County,* 75 Wn.2d 715, 743, 453 P.2d 832 (1969).

In this case, the flooding was due to a "force majeure." No action by the State caused the flooding, there was no project or public improvement, and there was no actual public *use.* Neither was there any permanent infringement preventing the original use of the land nor a total appropriation of appellant's property.

■ The most that can be said here is that, in the exercise of its police power to protect fish life for the benefit of all its citizens, the State restricted the extent to which appellant could change the bed of Morse Creek. Controlling work in a stream bed is within the purview of regulating and protecting state fisheries.

RCW 75.20.100 requires that:

[S]uch person or government agency shall submit to the department of fisheries and the department of game full plans and specifications of the proposed construction or work, complete plans and specifications for the proper protection of fish life in connection therewith, the approximate date when such construction or work is to commence, and shall secure the written approval of the director of fisheries and the director of game . . . before commencing construction or work thereon.

There is a rational relationship between the requirement of the statute and the objective of protecting fish life in the public interest. The policy of protecting fish habitat is based on necessity, and the procedure of regulating work in stream beds through the permit process has been determined by the legislature to be an appropriate method to achieve the desired control.

There was no allegation in appellant's complaint that the permit as issued to him was the result of arbitrary or capricious action on the part of the state agencies. Absent such an allegation, the issuance of the permit by the Department of Fisheries and by the Department of Game in the limited form that they deemed advisable must be presumed to be a proper exercise of state police power.

Whatever damage resulted to appellant's property, it cannot be said that it was caused by any affirmative act of the State. Even if the State is to some extent indirectly responsible for the damage, there was no public use involved, but simply a regulation deemed necessary for the protection of fish life. Damage under such circumstances can be said to be damnum absque injuria. The trial court was correct in dismissing the claim for inverse condemnation.

The judgment of the trial court is affirmed.

ROSELLINI, HAMILTON, STAFFORD, UTTER, HOROWITZ, and DOLLIVER, JJ., concur.

WRIGHT, C.J. (dissenting)—I dissent. For reasons set forth below, I believe that appellant has stated a cause of action in inverse condemnation. And, therefore, appellant need not invoke or attempt to invoke the administrative procedures under RCW 34.04.090. There are no conditions precedent to the filing of an inverse condemnation action. *See, e.g., Harkoff v. Watcom County,* 40 Wn.2d 147, 241 P.2d 932 (1952); *Boitano v. Snohomish County,* 11 Wn.2d 664, 120 P.2d 490 (1941); *Decker v. State,* 188 Wash. 222, 62 P.2d 35 (1936). In addition, I find it unnecessary to reach the issue of whether appellant has stated a cause of action in negligence.

Const. art. 1, § 16 (amendment 9) provides:

No private property shall be taken or damaged for public or private use without just compensation having been first made . . .

This constitutional provision is similar to provisions in approximately 24 state constitutions. *See* 2 J. Sackman, *Nichols' The Law of Eminent Domain* § 6.1[3] (1976).

This court has defined inverse condemnation as an

action brought against a governmental entity having the power of eminent domain to recover the value of property which has been appropriated in fact, but with no formal exercise of the power.

*Martin v. Port of Seattle,* 64 Wn.2d 309, 310 n.1, 391 P.2d 540 (1964). The basic elements of an inverse condemnation action are not in dispute. They are (1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid, (5) by a governmental agency with the power of eminent domain that has not instituted formal proceedings. I believe that all of these elements are established in the present case. Private property clearly was involved. Mr. Rains alleged that his land was injured in the amount of $119,000. Neither the Department of Fisheries nor the Department of Game has paid Mr. Rains for his loss. Both departments have the power of

eminent domain. *See* RCW 75.08.040 and 77.12.200. Neither department instituted formal condemnation proceedings. Thus, the only issues are (1) whether there has been a taking or damaging, and (2) whether a public use is involved.

### TAKING OR DAMAGING

The majority's primary argument is that there has been no taking or damaging in this case. They reason that respondents denied appellant's permit pursuant to RCW 75.20.100; that this statute is a valid exercise of the state's police power to protect fish life; and that under the facts here the injury to appellant from an exercise of the police power is noncompensable. I disagree.

The relationship between the state's police powers, and its power of eminent domain is by no means crystal clear. Often it seems that the courts and legal authors characterize these two powers as antagonistic: either there has been a valid exercise of the police power, or there has been an exercise of the power of eminent domain. But upon closer examination it is apparent that there may be a taking or damaging even under the guise of police power regulation. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 67 L. Ed. 322, 43 S. Ct. 158, 28 A.L.R. 1321 (1922); *Benenson v. United States,* 548 F.2d 939 (Ct. Cl. 1977); *Eldridge v. Palo Alto,* 57 Cal. App. 3d 613, 129 Cal. Rptr. 575 (1976); *Beckley v. Reclamation Bd.,* 205 Cal. App. 2d 734, 23 Cal. Rptr. 428 (1962); *Tuggle v. Manning,* 224 Ga. 29, 159 S.E.2d 703 (1968); *Czech v. Blaine,* __ Minn. __, 253 N.W.2d 272 (1977); *Metzger v. Brentwood,* __ N.H. __, 374 A.2d 954 (1977); *Vernon Park Realty, Inc. v. Mount Vernon,* 307 N.Y. 493, 121 N.E.2d 517 (1954); *Arverne Bay Constr. Co. v. Thatcher,* 278 N.Y. 222, 15 N.E.2d 587 (1938); *McMoran v. State,* 55 Wn.2d 37, 345 P.2d 598 (1959); 1 J. Sackman, *Nichols' The Law of Eminent Domain* § 1.42[7] (1976); Stoebuck, *Nontrespassory Takings in Eminent Domain* 171–72 (1977); Van Alstyne, *Taking or Damaging by Police Power: The Search for*

*Inverse Condemnation Criteria,* 44 So. Cal. L. Rev. 1 (1970); *cf. Fred F. French Investing Co. v. New York,* 39 N.Y.2d 587, 350 N.E.2d 381, 385 N.Y.S.2d 5 (1976). The difficulty usually lies in establishing where mere regulation ends and taking or damaging begins. Under the facts herein, I have no difficulty in concluding that there has been a taking or damaging. In this case we are concerned with a state law that limits the right of a private property owner to protect his land against damage by a nonnavigable stream. The cases that most clearly resemble this situation involve statutes that control development of wetlands or flood prone areas. *See* Bosselman, Callies & Banta, *The Taking Issue* 147–68 (U.S. G.P.O. No. 4111–00017, 1973). There has been a trend in recent judicial decisions to uphold these types of statutes. *See, e.g., Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 565 P.2d 1162 (1977); *Candlestick Properties, Inc. v. San Francisco Bay Conservation & Dev. Comm'n,* 11 Cal. App. 3d 557, 89 Cal. Rptr. 897 (1970); *Brecciaroli v. Connecticut Comm'n of Environmental Protection,* 168 Conn. 349, 362 A.2d 948 (1975); *Potomac Sand & Gravel Co. v. Governor,* 266 Md. 358, 293 A.2d 241 (1972); *Sibson v. State,* 115 N.H. 124, 336 A.2d 239 (1975); *J.M. Mills, Inc. v. Murphy,* ___ R.I. ___, 352 A.2d 661 (1976); *Just v. Marinette County,* 56 Wis. 2d 7, 201 N.W.2d 761 (1972). In all of the cases cited above, the landowner attempted to alter the physical characteristics of his property, which in some way affected a body of water on the property. In each of the cases the acts of the landowner were either flatly prohibited, or narrowly circumscribed by the state or one of its subdivisions. In each case the property owner alleged that the state's action constituted a taking or damaging without just compensation. In these cases there may have been some purely economic damage, but the property owner still had his land; it was still his to use for other lawful purposes. In none of these cases is there any allegation that the state action caused or contributed to actual physical loss. This is the crucial distinction between these cases and the present

case. It is the difference between economic lessening of the *value* of property and destruction of a substantial part of the property itself. Here, part of appellant's property literally and actually has washed away; he can no longer use that portion of his land for *any* purpose. Appellant knew this might happen so he applied for a hydraulic permit to change the course of the creek channel to protect against losses. Appellant was not seeking to develop or exploit his land, but merely trying to prevent it from being eroded away. This he was precluded from doing.

Physical destruction of part of one's land is one of the highest degrees of interference with private property. In cases where the state's action was not characterized as an exercise of its police power we have not hesitated to find inverse condemnation when there is physical injury to property. For example, in *Great Northern Ry. v. State,* 102 Wash. 348, 173 P. 40 (1918), agents of the state, while building a highway near plaintiff's property, did some blasting that caused debris to fall on plaintiff's railroad tracks. Among other things rails were bent and had to be replaced, idle crews were paid, and flagmen had to be provided to warn on–coming trains when additional slides occurred. These injuries to plaintiff were considered a taking or damaging of its property without just compensation. In reaching this result, the court said at page 351:

> The constitutional provisions must have been intended to protect all the essential elements of ownership which make property valuable. Among these elements is fundamentally the right of user, including, of course, the corresponding right of excluding others from the use. A physical interference with the land which substantially obstructs this right takes the plaintiff's property to just so great an extent as it is thereby deprived of its right. To deprive one of the use of his property is depriving him of his property, and the private injury is thereby as completely effected as if the property itself were physically taken.

In *Boitano v. Snohomish County, supra,* the county maintained a gravel pit. While excavating, workers uncovered a large underground spring. The water from this spring was diverted by the county onto plaintiff's property thereby making it unsuitable for farming which had been done there. We held this action by the county constituted inverse condemnation. *See also Decker v. State, supra; Conger v. Pierce County,* 116 Wash. 27, 198 P. 377, 18 A.L.R. 393 (1921). These cases are just as applicable when the state action that causes physical injury is characterized as an exercise of the police power.

In *In re Clinton Water Dist.,* 36 Wn.2d 284, 218 P.2d 309 (1950), the water district decided to condemn, appropriate and take a certain amount of cubic feet of water per second from a nonnavigable lake for domestic uses. The trial court determined that the water district would necessarily have to enforce certain health regulations when it took the water and these regulations would deprive riparian owners of boating, bathing, swimming, and fishing. The trial court awarded the riparian owners damages for the lessened market value of their property due to the loss of these rights, and this court affirmed. The court held that the riparian owners had the right of access to the water including the rights of boating, bathing, swimming, and fishing. There the right of access was protected from being taken or damaged without just compensation being paid even though the water district argued that the health regulations were an exercise of the sovereign's police power. This decision, which protects a property right, supports the position that the State must pay just compensation when it causes physical injury to private property by an exercise of its police power.

The alternative to my position is full of mischief. Under the majority's reasoning I see no limit to the amount of noncompensable physical injuries that the State can inflict on private property simply by labeling the state action an exercise of its police powers. This same fear is expressed in

W. Stoebuck, *Nontrespassory Takings in Eminent Domain*, 97–98 (1977):

It is understandable, the yearning the courts have to devise a police–power doctrine or something like it. The public benefit of regulations on the use of land usually far exceeds the harm to individual owners. A classic case is the zoning regulation or health or building code. Surely, the owner's range of possible uses is narrowed and his property in his land by that degree diminished. But, as Justice Holmes reminded us, government could hardly go on if it had to compensate for every minimal harm. In essence, then, the police–power doctrine seems an attempt to prevent government from having to pay countless small, perhaps doubtful, nuisance claims. Still, it worries us that the doctrine, though it may tend to destroy mostly small claims, does not necessarily do only that. Suppose the state blocks access to the water by a dike or wall; the owner will be compensated, assuming the act was not to improve navigation. But suppose the state enacts a regulatory statute prohibiting the owner from going onto the water. Who would care to explain to the owner that his inverse condemnation action will be barred? Would his neighbor feel better than he if the neighbor also was uncompensated after the state destroyed most of the value of his fishing resort by prohibiting fishing? How happy would they both be to know their other neighbor was paid because the state chose physically to appropriate a few feet of his land? The point is, of course, that the police–power doctrine does not do what it was apparently intended to do.

There are other objections. The doctrine employs a labeling of governmental activities that is both artificial and inutile. To pigeonhole government activity as being under the police power, the power to build dams, the power to raise armies, and so forth, may be convenient for certain discussions, but it should not for that reason produce legal consequences. Moreover, to say that the government is immune from compensation if it blocks access by a statute labeled "police power" but not if by a dike labeled "power to build public works" is to make the police power more sacred than the other powers. All are presumably necessary, all worthy of being exercised. Who is to say the police power has primacy? Not the fifth amendment. It and the eminent–domain clauses in the

state constitutions include all powers of government alike under their interdiction. If we may, by judicial fiat, remove the police power from the operation of the fifth amendment, why not also the power to build dams, roads, post offices—all powers? Exit fifth amendment. The point this time is, of course, that we make a false distinction when we predicate a taking vel non upon the kind of governmental power being exercised. We are quite willing to say the state exercises *both* its road—building and eminent–domain powers when it builds a road. Why should we be less willing to say some (though not all) regulatory measures are *also* exercises of eminent domain?

If it was our aim to limit compensation to those impacts that cause harm of certain magnitude, we should devise rules that zero in on that aspect. Why not say that "substantial" or "unreasonable" loss of riparian rights is compensable if caused by any form of state action? "Substantial" is a function of various factors and inherently is not susceptible of precise definition. Certainly an economic loss would have to be involved. However, not every economic loss is compensable, for the law does not recognize all elements of economic wealth as property. Therefore, some right of property would have to be diminished or destroyed. As imprecise as the concept of substantial loss might be, it at least works in the direction in which we wish to go, which the police–power doctrine does not.

(Footnote omitted.)

The majority argues, however, that the injuries complained of here were caused by flooding. That is but one part of the cause of appellant's loss. The real cause, however, was the denial of appellant's proposed creek alterations coupled with the flooding. One element cannot be separated from the other; they both contributed to appellant's loss. Respondents should not be absolved of liability.

An argument similar to the majority's was made in *Beckley v. Reclamation Bd.,* 205 Cal. App. 2d 734, 23 Cal. Rptr. 428 (1962). In that case defendants constructed a flood control system on the Sacramento River. This system destroyed and eliminated the old farmer–landowner flood

control system, which had been adequate to protect plaintiffs' property. Plaintiffs alleged that, as a result of this new system, water overflowed onto their property causing inundation resulting in permanent damage. Plaintiffs alleged further that, prior to the new system, they had never suffered flooding in their area. The trial court dismissed plaintiffs' complaint, but the Court of Appeals reversed. The court held that even if all the waters involved therein were characterized as flood waters this alone did not give the state the right to dispose of those waters on plaintiffs' land regardless of the reasonableness of the methods employed. The court pointed out that several statutory sections prohibited plaintiffs from constructing anything that interfered with the flood control system. As the court said: "Let plaintiffs now try to reclaim their lands and all of these statute–conferred powers could, and no doubt would, be invoked by respondents [defendants]." *Beckley v. Reclamation Bd., supra* at 746. The same reasoning applies here. The majority cannot claim that respondents are not liable for flooding damage because appellant is prohibited by statute from doing anything to control the flooding without first obtaining permission. In this case, the amount of work allowed by respondents was not enough to control the flooding. Thus respondents should be held liable.

## PUBLIC USE

The majority also argues that there is no public use. Their whole analysis is conclusionary. They say: "there was no project or public improvement, and there was no actual public *use.*"

It is impractical to define "public use" in comprehensive terms. At most it can be said that whether a public use is involved varies with the particular facts and circumstances of the case. In *Miller v. Tacoma,* 61 Wn.2d 374, 384–85, 378 P.2d 464 (1963) we said:

> The words "public use" are neither abstractly nor historically capable of complete definition. The words must be applied to the facts of each case in the light of current

conditions. In Washington, "public use" was defined in *Carstens v. Public Util. Dist. No. 1,* 8 Wn. (2d) 136, 142, 111 P. (2d) 583 (1941), cert. den. 314 U.S. 667, 86 L. Ed. 533, 62 S. Ct. 128 (1941). The court said:

"The term 'public use' is one which has been examined innumerable times by the courts, but no concise, clear definition thereof has emerged from the mass of judicial language devoted to the subject. Perhaps the best approach to the question is to be found in the following passage from *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834.

"'On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of "public use" has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that to–day there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion.'"

Under the facts and circumstances here, the "public use" element of appellant's inverse condemnation action has been filled.

I agree with the majority's statement that the protection of fish life by the State for the benefit of all citizens is a legitimate state interest. In fact the State *owns* the fish for the people as a whole. *Judd v. Bernard,* 49 Wn.2d 619, 304 P.2d 1046 (1956); *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P.2d 1101 (1936); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922). It is from this ownership interest that the

State derives its power to manage the fish resources of this state.

The involvement of the State in the fisheries resources goes far beyond mere regulation, however. Its activities extend to fisheries development and enhancement. The State is in the fish business. We have characterized the state's role as proprietary on at least one occasion. *State ex rel. Bacich v. Huse, supra* at 80. Further proof of this is found in RCW ₁75.08 and RCW 77.12. RCW 75.08.030 provides:

> The director shall establish and maintain state fish hatcheries, rearing stations, cultural stations, eyeing stations, brood ponds, trap sites, buildings, dock and harbor facilities, food fish and shellfish sanctuaries, rights of way, and such other installations and facilities as in his judgment may be necessary for the exercise of the powers and discharge of the duties of the director and the department.

To much the same effect is RCW 77.12.210. I have already noted that both respondents have the power of eminent domain. Thus, whenever the State acts to protect the fish resources, it is actually protecting public property. Any private property that is reasonably necessary to the maintenance and operation of property devoted to public use may be taken or damaged for public use. *Boitano v. Snohomish County,* 11 Wn.2d 664, 120 P.2d 490 (1941); *Decker v. State,* 188 Wash. 222, 62 P.2d 35 (1936). The fish life in the creek is public property. Respondents deemed it necessary to keep the creek in its present channel to maintain that public property. Thus when the creek flooded and caused erosion to appellant's property this was a necessary result of maintaining the fish life. It therefore follows that appellant's property was taken or damaged for a public use under the principles of *Boitano v. Snohomish County, supra;* and *Decker v. State, supra.*

For the reasons stated above, I believe the judgment of the trial court should be reversed.

BRACHTENBACH, J., concurs with WRIGHT, C.J.

Petition for rehearing denied April 11, 1978.