[No. 26922. *En Banc.* April 18, 1938.]

C. P. SHORT *et al., Appellants,* v. PIERCE COUNTY
*et al., Respondents.*[1]

[1]Reported in 78 P. (2d) 610.

Guy E. Kelly and Carl H. Skoog, for appellants.

Harry H. Johnston, John E. Belcher, John W. Fish-burne, B. Gray Warner, and F[1] M. Reischling, for respondents.

BEALS, J.—Plaintiffs, C. P. and Nellie Short, sued Pierce and King counties jointly, demanding judgment for $3,750, by way of damages to a tract of real estate in Pierce county, owned by plaintiffs, bordering on the Puyallup river, which land suffered damage during the high water of December, 1933. During the flood period above referred to, plaintiffs' land suffered from erosion, plaintiffs contending that approximately two acres were washed away. The balance of the land was damaged by agents and employees of Pierce county while engaged in an endeavor to control the high water, plaintiffs in this action contending that Pierce and King counties were jointly liable for the loss which plaintiffs suffered.

It appears that, in 1906, the somewhat erratic course of the White river, which had theretofore generally flowed into the Duwamish river and with it into Elliott bay in King county, was diverted so that the White river flowed into the Puyallup river, which empties into Commencement bay in Pierce county. The record does not disclose the names of the persons who caused the change in the course of the White river, but ever since 1906, the latter river has flowed into the Puyallup.

In 1913, the legislature enacted a statute (Laws of

1913, chapter 54, p. 156, Rem. Rev. Stat., § 9651 [P. C. § 5948] *et seq.*)

". . . authorizing counties to contract together for administrative and financial co-operation in the improvement, confinement and protection of rivers and the banks, tributaries and outlets thereof . . ."

Pursuant to this statute, the counties of Pierce and King entered into an agreement bearing date January 19, 1914, forming an intercounty river improvement district, and pursuant to this agreement constructed permanent improvements which continued the flow of the White river into the Puyallup. Under this contract, much other work was done, some thereof in an endeavor to control high water in the Puyallup river, and in the course of the work on the Puyallup, in order to protect the banks thereof from erosion, concrete revetments were constructed, and in some places the channel was straightened. Many of these improvements were completed prior to 1924, though some additional bulkheads were constructed in 1928. Manifestly, the danger from high water in the Puyallup river was lessened, and a degree of flood control was established and maintained.

During the year 1921, the legislature passed an act "relating to floods and providing for the prevention thereof" (Laws of 1921, chapter 30, p. 101, Rem. Rev. Stat., §§ 4057-1-2-3 [P. C. §§ 5852-1-2-3]), § 1, p. 101, of this act reading as follows:

"The state of Washington in the exercise of its sovereign and police power hereby authorizes any county alone or when acting jointly with any other county under any law to regulate and control the flow of waters, both navigable and non-navigable, within such county or counties, for the purpose of preventing floods which may threaten or cause damage, public or private." Rem. Rev. Stat., § 4057-1 [P. C. § 5852-1].

By this act, the county commissioners of any county, when they should deem it essential to the public interest for the prevention of floods, were given authority to remove drifts, jams, logs, debris, gravel, etc., forming obstructions to a stream, and were also given authority to require the removal of trees situated upon the banks of a water course. The same session of the legislature, by chapter 185 (Laws of 1921, chapter 185, p. 747, Rem. Rev. Stat., § 9663 [P. C. § 5959-1]), provided that

"No action shall be brought or maintained against any county alone or when acting jointly with any other county under any law, its or their agents, officers or employees, for any non-contractual acts or omissions of such county or counties, its or their agents, officers or employees, relating to the improvement, protection, regulation and control for flood prevention and navigation purposes of any river or its tributaries and the beds, banks and waters thereof: Provided, that nothing contained in this act shall apply to or affect any action now pending or begun prior to the passage of this act."

From the record in the case at bar, it appears that, during the year 1933, plaintiffs acquired the land which is the subject matter of this action, a tract bordering on the west bank of the Puyallup river, the land then and ever since being planted to berries.

About a year after plaintiffs purchased the land, a break appeared in a concrete revetment or bulkhead some two hundred feet above plaintiffs' land. Agents of the county took some measures to repair the damage, but the broken concrete was never replaced. During the flood period of December, 1933, the waters of the river, flowing through the hole in the bulkhead, completely destroyed the bulkhead and endangered many lands in the vicinity, the evidence indicating that two acres of plaintiffs' land were washed away. The

engineer of the intercounty river improvement district, in an attempt to control the flood waters, without plaintiffs' permission, entered upon plaintiffs' land with a crew of over a hundred men, and proceeded to do what appeared necessary to control the high waters. The employees of the county used much of the topsoil on plaintiffs' land for the purpose of filling sandbags; plaintiffs' land was trampled down; their berry bushes were destroyed; and the wooden berry frames were burned.

Plaintiffs contended before the superior court, and contend here, that, under Art. I, § 16, of the state constitution, the "eminent domain" section, which provides that no private property shall be taken or damaged for public or private use without just compensation having been first made, the counties forming the intercounty river improvement district are liable to them in damages; and that, if chapter 185, Laws of 1921, *supra,* purports to relieve counties from such responsibility, the same is unconstitutional.

The action was tried to the court, sitting with a jury; and at the close of plaintiffs' case defendant King county moved for a dismissal of the action on the ground that, under the intercounty contract, it was not liable, and defendant Pierce county moved for a nonsuit on the ground that the evidence was insufficient to justify the submission of the case to the jury. These motions were sustained by the trial court, and, after the denial of plaintiffs' motion for a new trial, judgment was entered dismissing the action, from which judgment plaintiffs have appealed.

Error is assigned upon the denial of appellants' motion to strike an affirmative defense contained in respondents' answer; upon the refusal of the court to strike respondents' amended answer; upon the denial of appellants' motion for a new trial; upon the entry of

judgment of dismissal; and upon the denial of appellants' motion to retax costs. Assignments of error one to seven, inclusive, may be considered together, these assignments all going to the basic right of appellants to recover against the respondent counties or either of them.

Respondents argue that, in endeavoring to control the waters of the Puyallup river, they were municipal corporations performing governmental functions in an effort to protect life, the public health and safety, and public and private property. Respondents argue that, under the facts and the law, the trial court properly dismissed the action.

Appellants strongly rely upon the case of *Conger v. Pierce County*, 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393, decided by this court sitting *En Banc* May 28, 1921, which case was nowise affected by chapter 185, Laws of 1921, *supra*. As stated by this court, the case cited was an action to recover damages caused by the Puyallup river. Under the intercounty agreement above referred to, Pierce and King counties had performed work for the purpose of straightening and deepening the river channel. In the course of this work, a bend in the river had been eliminated, which caused the current to flow against the bank on plaintiff's property, and during a freshet plaintiff's land suffered from erosion, and some of the improvements on the land were washed away. This court held that the counties were liable, and reversed the judgment entered by the trial court dismissing the action upon sustaining a motion for a nonsuit.

In the course of the opinion, this court called attention to the fact that chapter 54, Laws of 1913, *supra,* under which acts the counties had proceeded in straightening and deepening the river channel, contained no indication that the legislature considered

that public necessity demanded or required the making of the improvement. The court also held that the improvement was not made to preserve public health, peace, morals, or welfare, nor to reclaim large tracts of land which otherwise might have been a waste; and that "the idea of the impelling necessity, which seems to be the chief ingredient of the police power, is entirely absent." It was expressly held that any damage caused by the counties' operations could not be excused under any reasonable interpretation of the law of police power. The judgment dismissing the action was reversed, and the action remanded for trial.

In the case cited, it appeared that, prior to the improvement, the course of the river was such that the current touched the plaintiff's land very lightly. The elimination of a bend caused the current to strike the bank on plaintiff's land with considerable force, and during a period of high water, the damage complained of occurred. The court was of the opinion that the work performed in improving the river was not in aid of navigation, but to correct the tendency of the stream to overflow its banks. The court stated that no question of "outlaw waters" was in the case. Being of the opinion that the counties, in straightening the course of the river, were not exercising the police power of the state, the court apparently treated the work which they had done as of the same general class as work performed by a city in improving a street, and, it appearing that testimony had been introduced tending to show that the counties' engineers must have known that the improvements which they were making would cause the plaintiff's land to be eroded, remanded the case to the superior court for further proceedings.

Appellants contend, first, that chapter 185, Laws of 1921, does not apply to such a case as is here presented; and second, that if it be held to apply to such an action,

it is void as in contravention of Art. I, § 16, of the state constitution above referred to. Appellants rely upon the cases of *Farnandis v. Great Northern R. Co.,* 41 Wash. 486, 84 Pac. 18, 111 Am. St. 1027, 5 L. R. A. (N. S.) 1086, and *Wong Kee Jun v. Seattle,* 143 Wash. 479, 255 Pac. 645, 52 A. L. R. 625. In the first case, it was held that the owner of property damaged by the construction of a tunnel was entitled to recover under the constitution, whether or not the defendant had been guilty of negligence in carrying on the work; and in the second case, the owner was awarded damages because of a slide, which it was contended resulted from the removal of lateral supports in the regrade of an adjoining street. In neither of the cases cited was there involved the question of the police power of the state or a subdivision thereof, nor was there present any question of emergency action deemed necessary to avert public calamity.

Appellants' complaint seems to have been drafted upon the theory of negligence on the part of respondents, appellants alleging the existence of a hole in the bulkhead above their property, which bulkhead they alleged had been specially constructed by respondents for the protection of appellants' property and other land adjacent thereto. Appellants allege that, although respondents had notice of the break in the bulkhead, they failed to repair the same with concrete, but filled the hole in the revetment with stakes and brush, which during the high water period of December, 1933, was washed out, permitting the flood waters to run through the hole, thereby destroying the concrete revetment. It clearly appears that the floods which occurred at the time mentioned were unusually severe; and heavy snow, followed by violent rain storms, resulted in an immense amount of water suddenly rushing toward sea level. In their

briefs, appellants call attention to the fact that the violence of the flood was such that the concrete revetment was lifted and turned over into the river bed, and that the mass of concrete was washed on down the river past appellants' property. The water was certainly higher than it had been for many years. Many of the improvements along the river near appellants' property were installed after the effective dates of chapters 30 and 185, Laws of 1921.

Appellants do not contend that either the revetments straightening the channel of the river or the bulkheads which had been constructed on the banks thereof had caused any damage to their property prior to the date of the flood. At least, they claim no compensation for such damage in this action. Upon this phase of the case, their principal claim seems to be based upon the fact that the county had failed to repair with concrete the damaged bulkhead situated a little above appellants' property; and that, because the bulkhead had not been so repaired, the flood waters dashed through the hole in the bulkhead and tore out the entire wall, thereby laying appellants' property open to erosion.

In the case of *Conger v. Pierce County, supra,* this court held that, from the evidence, it appeared that the controlling purpose of the work performed by the counties was the protection of their roads and bridges; and that neither the state nor the people of the state or counties were interested in the improvements, save in a very indirect way and as taxpayers. For these reasons, the court distinguished that case from those in which particular elements existed upon which the police power is readily based.

Legislative enactments authorizing various improvements for the purpose of flood control have been upheld by this court. *Hansen v. Hammer,* 15 Wash.

315, 46 Pac. 332; *Pierce County v. Thompson,* 82 Wash. 440, 144 Pac. 704. Many courts have held that the state or a municipal subdivision thereof, under the police power, may legally construct flood control projects; and if it appear that the authorities acted reasonably and in good faith for the benefit of the public, no liability exists for injuries caused by overflow or erosion. *Jackson v. United States,* 230 U. S. 1, 57 L. Ed. 1363, 33 S. Ct. 1011; *Hughes v. United States,* 230 U. S. 24, 57 L. Ed. 1374, 33 S. Ct. 1019, 46 L. R. A. (N. S.) 624; *Cubbins v. Mississippi River Commission,* 241 U. S. 351, 60 L. Ed. 1041, 36 S. Ct. 671; *Salliotte v. King Bridge Co.,* 122 Fed. 378, 65 L. R. A. 620; *Rex v. Commissioners,* 8 Barn. & C. 355; *Hoard v. Des Moines,* 62 Iowa 326, 17 N. W. 527; *Lamb v. Reclamation Dist. No. 108,* 73 Cal. 125, 14 Pac. 625, 2 Am. St. 775; *Shelbyville & Brandywine T. Co. v. Green,* 99 Ind. 205. In 1 Nichols on Eminent Domain (2d ed.) 315, § 113, is found the following:

"It has also been held that it is a taking of property to turn the current of a stream upon private land so as to wear it away, if the owner cannot avert the injury by reasonable precautions; but when the public authorities merely build up and strengthen one bank of a river to protect it from flooding or erosion, the owner of land on the opposite bank cannot complain if the effect of such construction is to cause his land to be flooded or washed away."

It is matter of common knowledge that, in the counties of Pierce and King and other adjoining counties, dangerous floods occur, which not only cause vast damage to property but endanger the public health and safety. It has been the custom of our rivers to change their courses during the periods of high water, and every unusually rainy season has resulted in the loss of much rich and valuable land by erosion. By the acts of 1921, the legislature declared a public policy

new to this jurisdiction, and authorized counties to regulate and control the flow of waters for the purpose of preventing floods. This legislative policy having been declared, the scope of the opinion of this court in the case of *Conger v. Pierce County, supra,* has been materially narrowed. By chapter 72, Laws of 1937, p. 257, Rem. Rev. Stat. (Sup.), § 9663E-1 *et seq.,* the legislature provided for the establishment of flood control districts, setting up elaborate machinery for the control of floods. While not important in connection with the case at bar, this later act constitutes a further declaration of the legislative intent. We are convinced that the work performed in improving the channel of the Puyallup river in an attempt to control the flow thereof should be held to be work performed by way of flood control and public in its nature.

As to appellants' contention that respondents are liable because they failed to repair the defect in the bulkhead or revetment a short distance above appellants' property, we find no basis for holding that appellants were entitled to go to the jury upon this question.

Examination of the record convinces us that appellants made no case entitling them to damages on account of any erosion suffered by their land. Chapters 30 and 185, Laws of 1921, are not obnoxious to the objections urged against them by appellants, and apply to the situation here presented.

The question of respondents' liability for damage to the remainder of appellants' property must now be considered. It appears that, when the county officials discovered that the concrete bulkhead above appellants' property had gone down the river, and that the flood was eating away appellants' land and adjoining properties, they summoned a large force of

men, variously estimated at from fifty to one hundred, and put into effect emergency operations to control the flood waters of the river. Many bags were filled with earth, most of the topsoil on appellants' land being appropriated to this purpose. Scrapers were put into operation, much work done, and good accomplished. After the flood subsided, the county continued to use appellants' property as a base for its flood control operations, tractors were moved thereon, and the county continued to use the land for approximately five months. Concrete revetments were constructed, and by the time the operation was concluded, appellants' berry bushes were gone, the stakes and frames supporting the bushes had been used for fuel, little topsoil remained, and so much of the land as had not disappeared completely had been greatly damaged. Appellants claimed damages for these injuries to their property.

It is the law that, in meeting an emergency, such as fire, flood, or pestilence, public officials and private citizens may employ almost any available means in an endeavor to control the danger. In the case of *American Print Works v. Lawrence,* 21 N. J. L. 248, the supreme court of New Jersey used the following language:

"But, is property, destroyed to arrest the progress of a conflagration, taken *for public use,* within the constitutional sense of the term?

"The right to take private property for public use is an attribute of sovereignty—it is inseparable from the sovereign power. It is the right of eminent domain, of sovereign or transcendental property in the goods of the subject. It is a right founded on the nature and end of sovereignty, growing out of the nature of the social compact, by virtue of which every member of society holds his property upon condition that it is subject to be taken for the use of the State whenever the public good requires it. It is justified

on the ground of state necessity. It is founded on the same principle as the right of raising taxes and subsidies for the support of government and the right of regulating the use of private property by sumptuary laws. 2 *Burlem* 145, c. 5 § 6; *Ib.* 159, c. 5 §§ 24-29; 12 *Coke* 13, *Case of the Prerogative*, &c.

"But the right to destroy property to prevent the spread of a conflagration rests upon other and very different grounds. It appertains to individuals, not to the State. It has no necessary connection with, or dependence upon the sovereign power. It is a natural right existing independently of civil government.

"It is both anterior and superior to the rights derived from the social compact. It springs not from any right of property claimed or exercised by the agent of destruction in the property destroyed, but from the law of necessity. The principle as it is usually found stated in the books is, that 'if a house in a street be on fire, the adjoining houses may be pulled down to save the city.' But this is obviously intended as an example of the principle, rather than as a precise definition of its limits. The principle applies as well to personal as to real estate; to goods as to houses; to life as to property—in solitude as in a crowded city; in a state of nature as in civil society. It is referred by moralists and by jurists to the same great principle, which justifies the exclusive appropriation of a plank in a shipwreck, though the life of another be sacrificed; with the throwing overboard of goods in a tempest for the safety of the vessel . . . It rests upon the maxim, '*Necessitas induciz privilegium quoad jura privata.*'"

In the case of *Field v. Des Moines,* 39 Iowa 575, 18 Am. Rep. 46, it appeared that the plaintiff demanded compensation from the city because the city authorities, in an endeavor to stop a fire, tore down and destroyed two of plaintiff's buildings. The supreme court of Iowa quoted from Dillon on Municipal Corporations, § 756, as follows:

" 'The rights of private property, sacred as the law regards them, are yet subordinate to the higher de-

mands of the public welfare. *Salus populi suprema est lex.* Upon this principle, *in cases of imminent and urgent public necessity, any individual or municipal officer may raze or demolish houses and other combustible structures* in a city or compact town, to prevent the spreading of an extensive conflagration. This he may do independently of statute, and without responsibility to the owner for the damages he thereby sustains.' "

The court, after citing many authorities, held that the city was not liable.

In 1 Sutherland on Damages (4th ed.), 11, § 3, the rule is stated as follows:

"Private houses may be pulled down in the interest of the public to prevent the spread of fire and bulwarks may be raised on private property as a defense against a public enemy. So owners of land exposed to the inroads of the sea, or commissioners having a statutory power to act for a number of such owners, have a right to erect barriers, though they are consequentially prejudicial to others."

In 1 Nichols on Eminent Domain (2d ed.), 263, § 96, the rule is stated as follows:

"When immediate action is necessary in order to avert a great public calamity, private property may be controlled, damaged or even destroyed without compensation. Under such conditions any individual has the right to enter another's land and destroy his property, and if he acts with reasonable judgment he is not liable to the owner. If the individual who thus enters and destroys private property happens to be a public officer whose duty it is to avert the impending calamity, the rights of the owner of the property to compensation are no greater. The most familiar example of the exercise of this right is seen in case of a fire. The neighbors and firemen freely trespass on the adjoining land, and houses are even blown up to prevent the spread of the conflagration. The danger of a flood or the existence of a pestilence may call for equally drastic action. Statutes sometimes provide

for compensation in such cases, but unless the provisions of the statute are strictly complied with, the owner stands no better than he did at common law. Even in those states in which the statutes regulate or specifically authorize the destruction of property in the presence of impending calamity, such legislation is not the exercise of a new power, but a recognition and continuation of the old power, and hence is due process of law, and does not effect a taking of property without compensation in the constitutional sense."

The opinions of the supreme court of the United States in the case of *Bowditch v. Boston,* 101 U. S. 16, 25 L. Ed. 980, and *Hughes v. United States, supra,* should also be read in this connection.

Manifestly, the damage to appellants' property falls into two classes: First, emergency work performed in an attempt to control an existing and most dangerous flood condition, which was likely to destroy not only appellants' property but much other property in the neighborhood; and second, damage caused by work done after the flood had subsided, in constructing permanent flood control improvements. We hold that appellants may not recover for damage caused by acts of agents of the county in an attempt to control immediate danger from the flood. If it was necessary to use earth from appellants' property in filling sandbags to control the flood, respondents' agents and employees were justified in stripping the topsoil from appellants' property, and appellants cannot recover damages therefor. Whether such a step was necessary, or whether other earth was immediately available, we do not know. That question must be determined by the trier of the fact.

We do hold, however, that for the use of appellants property for weeks and months following the period of the flood, and for any damage which appellants can

show resulted from this use, by way of destruction of their berry bushes or vines and the frames supporting the same, or otherwise, appellants are entitled to recover, under the constitutional prohibition against the taking or damaging of private property without just compensation. Clearly, respondents had no right to use appellants' property for any such period of time and to damage the same without appellants' consent, and if no consent was given, without compensation.

The record shows that respondent counties made separate motions to dismiss. The judgment, however, simply recites that,

". . . on concluding the case of the plaintiff, counsel for defendants challenging the sufficiency of the evidence and moving for a dismissal,"

and concludes:

"It is now ordered, adjudged and decreed, that plaintiffs take nothing by their action, and costs be taxed against the plaintiffs by the clerk of the court; that the action be dismissed with prejudice, to which plaintiffs except and exception is allowed."

The question, then, of whether or not respondent King county was entitled to a dismissal of the action for reasons other than those applying to respondent Pierce county, is not before us for review.

Finally, appellants contend that the court erred in denying their motion to retax costs. The result which we reach on this appeal renders consideration of this question unnecessary.

The judgment appealed from is reversed, and the cause remanded, with instructions to proceed with the trial in accordance with the views herein expressed. Costs in the superior court will, of course, abide the final result of the action.

STEINERT, C. J., MAIN, BLAKE, GERAGHTY, SIMPSON, and ROBINSON, JJ., concur.

HOLCOMB, J. (dissenting)—It is difficult to understand the logic and the result of the majority's decision.

The majority say that, by the legislative policy since 1921, the scope of the opinion in *Conger v. Pierce County*, 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393, "has been materially narrowed." On the contrary, that decision was entirely abrogated by the enactment of chapters 30 and 185, Laws of 1921.

The majority correctly hold that chapters 30 and 185, Laws of 1921, are not obnoxious to the objections urged against them by appellants and apply to the situation here presented. In other words, that those acts are constitutional. Then, immediately, in the face of chapter 185, Laws' of 1921, they hold that damages to the remainder of appellants' property may be allowed.

It is axiomatic that the counties could not be sued without consent. The right to sue counties for torts was given by Rem. Rev. Stat., § 951 [P. C. § 8394], but such a right is not a vested right. It was repealed by the Laws of 1921, chapter 185, § 1.

In *Bailey v. School Dist. No. 49*, 108 Wash. 612, 185 Pac. 810, we had before us the act of 1917, which provided that:

" 'No action shall be brought or maintained against any school district or its officers for any non-contractual acts or omission of such district, its agents, officers or employees, relating to any park, playground, or field house, athletic apparatus or appliance, or manual training equipment, whether situated in or about any school house or elsewhere, owned, operated or maintained by such school district.' "

Mackintosh, J., wrote the opinion for the court, concurred in by a unanimous department of this court, approving former cases by this court to the effect that the right to sue a school district is not a vested right

and could be taken away by the legislature, which was done. In *Swanson v. School Dist. No. 15,* 109 Wash. 652, 187 Pac. 386, the same law was again before us, and Main, J., writing the opinion for the court, again held and reaffirmed the *Bailey* case, *supra,* that such a right was not a vested right and could be taken away by the legislature.

Those pronouncements certainly govern this case. Appellants have no right whatever to bring action against the counties for any damages under the flood control acts.

The judgment is right and should be affirmed.

MILLARD, J., concurs with HOLCOMB, J.

