177 P.3d 716 (2008)
Don L. FITZPATRICK and Pam Fitzpatrick, husband and wife; Brad Sturgill and Heather Fitzpatrick Sturgill, husband and wife, Appellants,
v.
OKANOGAN COUNTY; The State of Washington, Respondents,
John L. Hayes and Jane Doe Hayes, husband and wife; and Methow Institute Foundation, Defendants.
No. 25161-6-III.
Court of Appeals of Washington, Division 3.
January 22, 2008.
*717 John Maurice Groen, Groen Stephens & Klinge LLP, Diana M. Kirchheim, Pacific Legal Foundation, Bellevue, WA, for Appellants:
Mark Robert Johnsen, Attorney at Law, Seattle, WA, Paul Francis James, Office of the Attorney General, Olympia, WA, Douglas Gilmore Webber, Attorney at Law, Winthrop, WA, for Defendants.
SCHULTHEIS, J.
¶ 1 The common enemy rule, which allows landowners to repel surface waters to the detriment of their neighbors, does not apply when the landowner obstructs a watercourse *718 or natural drainway or when the landowner obstructs riparian water from entering a flood channel. Currens v. Sleek, 138 Wash.2d 858, 862-63, 983 P.2d 626, 993 P.2d 900 (1999); Sund v. Keating, 43 Wash.2d 36, 42-43, 259 P.2d 1113 (1953). Landowners appeal summary dismissal of their inverse condemnation claim. They claim that a dike owned, constructed, maintained, and modified by government entities blocked a side channel through which high waters would, have otherwise flowed. The landowners presented evidence that the dike caused high waters flowing down the river to change the course of the channel and swept their land and home down the river. We conclude that they have presented material issues of fact that preclude summary judgment. We therefore reverse and remand.

FACTS
¶ 2 Siblings Heather Fitzpatrick Sturgill and Don L. Fitzpatrick (the landowners) acquired property along the Methow River in Mazama, Washington, in the early 1980s. They built a log home and garage in the mid 1980s. Prior to June 16, 2002, the channel alignment of the Methow River was generally southwest and away from plaintiffs' property. Their home was 80 to 100 feet from the Methow River, which was outside of the 100-year flood line.
¶ 3 On June 16, during a two-year storm event, the river avulsedthe channel changed course very quickly and resulted in a new channel alignment separate from the previous channel alignment. The change in channel alignment caused a substantial force of water to be redirected straight at the landowners' property, resulting in a rapid erosion of the land and ultimately causing their house to collapse into the river. The landowners permanently lost their home, its contents, and a significant portion of land. The garage is now located immediately along the edge of the new riverbank.
¶ 4 The landowners filed an action against the State of Washington and Okanogan County claiming that the government entities' construction of a dike upstream from their property caused the avulsion and the loss of their home.[1]
¶ 5 The government entities each moved for summary dismissal of the landowners' action. The landowners responded with evidence that, sometime around 1975, the county and the state sponsored and constructed the Sloan-Witchert Slough Dike along the Methow River's downstream right bank, approximately one and one half miles upstream from the landowners' property. The dike was constructed as a public project to defend Washington State Highway 20, the Weeman Bridge, and several private properties from flooding. The dike was subsequently repaired and/or extended between 1978 and 1999.
¶ 6 The landowners also presented evidence through Jeffrey Bradley, Ph.D., a water resource management expert, that the avulsion was caused by the dike's blockage of natural side channels, which would have relieved the flow of water in the river and prevented the landowners' loss. The landowners asserted that the evidence presented genuine issues of material fact. The trial court granted summary dismissal.

DISCUSSION
¶ 7 Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Phillips v. King County, 136 Wash.2d 946, 956, 968 P.2d 871 (1998); CR 56(c). The motion should be granted only if, from all the evidence, a reasonable person could reach only one conclusion. Folsom v. Burger King, 135 Wash.2d 658, 663, 958 P.2d 301 (1998).
¶ 8 We review motions for summary judgment de novo, engaging in the same inquiry as the trial court, which is to treat all facts and reasonable inferences in the light most favorable to the landowners, as the nonmoving *719 party. Phillips, 136 Wash.2d at 956, 968 P.2d 871. The government entities, as the moving party, have the burden to demonstrate the absence of a genuine dispute as to any material fact with all reasonable inferences resolved against them. Folsom, 135 Wash.2d at 663, 958 P.2d 301.
¶ 9 If there is a dispute regarding the "nature or classification" of the water at issue, it is a question of fact and therefore improper for resolution on summary judgment. Snohomish County v. Postema, 95 Wash.App. 817, 820, 978 P.2d 1101 (1998). Similarly, "[w]hen a question is raised as to the existence of a natural watercourse, that question must be determined by the trier of fact." Buxel v. King County, 60 Wash.2d 404, 408, 374 P.2d 250 (1962) (citing Tierney v. Yakima County, 136 Wash. 481, 239 P. 248 (1925)). That is precisely the issue here.
COMMON ENEMY DOCTRINE
¶ 10 Washington courts have recognized this common law rule in some form for more than a century, which recognizes that "surface water, caused by the falling of rain or the melting of snow, and that escaping from running streams and rivers, is regarded as an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others." Cass v. Dicks, 14 Wash. 75, 78, 44 P. 113 (1896). Because its strict application has proven inequitable, our courts have developed exceptions to the common enemy rule. Currens, 138 Wash.2d at 861-62, 983 P.2d 626.
¶ 11 Washington's common enemy doctrine "allows landowners to alter the flow of surface water to the detriment of their neighbors, so long as they do not block a watercourse or natural drainway." Id. at 862-63, 983 P.2d 626. Landowners are not shielded from Milky if they dam up a stream, gully, or drainway, because "[a] natural drainway must be kept open to carry water into streams and lakes." Id. at 862, 983 P.2d 626 (citing 78 AM.JUR.2D Waters § 134 (1975)).
¶ 12 The landowners have presented evidence that the waters held back by the dike would have otherwise flowed through natural side channels and rejoined the river. The government entities argue that the common enemy doctrine insulates upstream landowners, as a matter of law, from damage caused by diking because the watercourse/drainway obstruction rule does not apply to diking. The government entities rely largely on Halverson v. Skagit County, 139 Wash.2d 1, 983 P.2d 643 (1999).
¶ 13 In Halverson, the landowners' properties along the Skagit River were flood-damaged, which they claimed was exacerbated by the presence of levees along the river.[2] Our Supreme Court reversed the judgment because, in part, the common enemy doctrine provided a complete defense to the county's liability and the trial court failed to properly instruct the jury on the doctrine. Halverson, 139 Wash.2d at 13-14, 983 P.2d 643.
¶ 14 The landowners in this case properly point out that the overbank floodwaters in Halverson did not flow within a defined flood channel. Id. at 14 n. 14, 983 P.2d 643. The Halverson court implied that if there were such evidence, it would apply an aspect of the doctrine expressed in Sund, in which case it would reach a different result. Id. (citing Sund, 43 Wash.2d at 42-46, 259 P.2d 1113).
¶ 15 We also find Sund to be persuasive authority. There, the court examined the character that water assumes when it overflows a riverbank in times of flooding. Sund, 43 Wash.2d at 41-43, 259 P.2d 1113. The government entities correctly point out that our courts have held that such water is surface wateragainst which they are entitled to protect themselves under the common enemy doctrine. Halverson, 139 Wash.2d at 14-15, 983 P.2d 643; Sund, 43 Wash.2d at 41-42, 259 P.2d 1113 (citing Cass, 14 Wash. 75, 44 P. 113; Harvey v. N. Pac. Ry. Co., 63 Wash. 669, 116 P. 464 (1911); Morton v. Hines, 112 Wash. 612, 192 P. 1016 (1920); *720 DeRuwe v. Morrison, 28 Wash.2d 797, 184 P.2d. 273 (1947)).
¶ 16 However, the Sund court declared: "The weight of authority inclines to the view that surface water, which has joined the course of a stream and has become subject to its current, ceases to possess the characteristics of diffused or vagrant surface waters and becomes part of the stream." Sund, 43 Wash.2d at 42, 259 P.2d 1113; accord Halverson, 139 Wash.2d at 14-15, 983 P.2d 643; Marshland Flood Control Dist. of Snohomish County v. Great N. Ry. Co., 71 Wash.2d 365, 369-70, 428 P.2d 531 (1967). Under the facts in Sund, the court held that the law of riparian water imposed liability to a landowner whose excavation near the bank of a stream caused the stream to change its course. Sund, 43 Wash.2d at 42, 259 P.2d 1113; see also Marshland, 71 Wash.2d at 369-70, 428 P.2d 531.
¶ 17 In Sund, the stream was normally about 15 to 20 feet wide and 18 inches deep. 43 Wash.2d at 38, 259 P.2d 1113. The riparian landowner's excavation, which interfered with a natural barrier that had served to keep floodwaters in check, was "fifty to sixty feet "north of the north margin of [the stream]." id. The flood channel included the land between the stream's bank and the natural barrier, which served as the bank of the flood channel. Id.
¶ 18 Here, the landowners' expert stated that the side channels were a part of the floodplain and the dikes interfered with natural high flow to these side channels. Though the government entities did not counter this evidence, the state characterizes the side channels as "merely depressions in the floodplain that carry water only in high water events." State's Br. at 13. To the contrary, as the landowners point out, a memorandum authored by a state hydrologist with the department of ecology reads:
This road and dike work has impacted the Methow River by cutting off at least three natural overflow channels in the floodplain, thereby compressing more flood flow into the main channel and reducing the natural flood conveyance capacity of the river. Overall this work has cut off about a mile of overflow channels. Additional velocity and quantities of high flows compressed into the main channel during floods are disrupting the natural bed form of the river and causing additional erosion and scour of the main channel downstream.
Clerk's Papers (CP) at 254-55.
¶ 19 The character of the water is an issue of fact. The landowners have presented an issue of material fact as to the existence of circumstances under which the legal rule in Sund would apply:
[I]f the waters were in the flood channel of a stream, then certain principles become self-evident: (a) They are properly classified as riparian waters rather than surface waters; (b) being riparian waters, the rules relating to watercourses would apply. . . . As a consequence of the applicability of the law of riparian waters, appellants in the case at bar could neither intentionally nor negligently disturb the channel of the stream for their own purposes or to flood respondents' land; nor could they interfere with the flood channel of the streamfor that, also, is properly regarded as part of the stream.
43 Wash.2d at 44-45, 259 P.2d 1113.
¶ 20 The government entities insist that Sund does not apply because in that case the parties were adjoining landowners disputing the flood channel of a stream; but here the landowners do not have riparian rights to waters in the stream that the government entities obstructed. We are not persuaded.
¶ 21 We agree that when riparian rights exist, they derive from the ownership of land contiguous to or traversed by a watercourse. Dep't of Ecology v. Abbott, 103 Wash.2d 686, 689, 694 P.2d 1071 (1985). However, it is important to note that the Sund court adopted the following language it quoted from a water rights treatise:
"Every stream flowing through a country subject to a changeable climate must have periods of high and low water. And it must have, not only its ordinary channel which carries the water in ordinary times, but it must have, also, its flood channel to accommodate the water when additional quantities find their way into the stream.

*721 The flood channel of the stream is as much a natural part of it as is the ordinary channel. It is provided by nature, and it is necessary to the safe discharge of the volume of water. With this flood channel no one is permitted to interfere to the injury of other riparian owners. . . . Thus, the courts are very nearly agreed that the flood channel must be considered as a part of the channel of the stream, and that no structures or obstructions of any kind can be placed in its bed which will have a tendency to dam the water back upon the property of the upper riparian owner."
Sund, 43 Wash.2d at 43, 259 P.2d 1113 (emphasis added) (emphasis omitted) (quoting 3 FARNHAM, WATERS AND WATER RIGHTS, 2561, § 880). The landowners' property is situated on the Methow River, which affords them standing.
¶ 22 Sund also relied on O'Connell v. East Tennessee, Virginia & Georgia Railway Co., 87 Ga. 246, 13 S.E. 489, 490 (1891), which held that because floodwaters were not surface waters, a flood channel cannot be obstructed without incurring liability. The Georgia court distinguished between surface water and floodwater:
"If the flood water becomes severed from the main current, or leaves the stream never to return, and spreads out over the lower ground, it has become surface water. But if it forms a continuous body with the water flowing in the ordinary channel, or if it departs from such channel animo revertendi, presently to return, as by the recession of the waters, it is to be regarded as still a part of the river."
Sund, 43 Wash.2d at 43, 259 P.2d 1113 (quoting O'Connell, 13 S.E. at 489).
¶ 23 The O'Connell court agreed with the FARMHAM, supra, treatise and other authorities in holding that the volume of water due to seasonal flow does not define a river or its flood channels, where these' points in the river "act as natural safety-valves in times of freshet." O'Connell 13 S.E. at 489.
¶ 24 The landowners presented evidence that the side channel drainways identified by its expert constituted flood channels under Sund. Such water cannot be blocked as surface water because it is part of the waterway. And waterways cannot be blocked. Conger v. Pierce County, 116 Wash. 27, 198 P. 377 (1921).
¶ 25 The county concedes that "`even though a downhill landowner can lawfully repel surface water from his or her land, it must be done without blocking a natural water course or drainway.'" County's Br. at 14 (emphasis omitted) (quoting Colwell v. Etzell, 119 Wash.App. 432, 441, 81 P.3d 895 (2003)). But it claims that liability attaches only to downstream owners who damage the property of upstream landowners by backedup water. E.g., Curren, 138 Wash.2d at 862, 983 P.2d 626. It is true that the only cases presented by the, parties involve those factual circumstances.[3] But the government entities provide no authority expressly stating, and no argument as to why, the rule applies only under those circumstances.
¶ 26 In fact, Conger held that the state and county could not be relieved from liability to downstream owners when it straightened a waterway, causing the course of the river's current to shift and erode the downstream landowners' property. 116 Wash. at 42, 198 P. 377; see also Marshland, 71 Wash.2d 365, P.2d 531 (finding liability for damage to railroad bridge from increased water flow in the waterway due to diking).
IMMUNITY
¶ 27 The county claims it has immunity from the damages sought here. RCW 86.12.020 authorizes counties to construct and maintain dikes and levees to protect against floods. RCW 86.12.037 provides: "No action shall be brought . . . against any county . . . for any noncontractual acts or omissions . . . relating to the improvement, protection, regulation and control for flood prevention and navigation purposes of any *722 river or its tributaries and the beds, banks and waters thereof."
¶ 28 RCW 86.12.037 was enacted to shield counties from liability for their efforts to protect the public from flood damage. Short v. Pierce County, 194 Wash. 421, 430-31, 78 P.2d 610 (1938). The statute provides immunity to counties where their negligence in the construction and maintenance of flood control devices results in damage to private property during floods or other periods of high water. Id. at 431, 78 P.2d 610.
¶ 29 Similarly, the state argues that it is immune. RCW 86.16.071 provides: "The exercise by the state of the authority, duties, and responsibilities as provided in this chapter [flood plain management] shall not imply or create any liability for any damages against the state." Damages include harmful inundation, water erosion of soil, stream banks and beds, and stream channel shifting. RCW 86.16.120.
¶ 30 The landowners correctly note that the immunity does not extend to an unconstitutional taking. In Paulson v. County of Pierce, 99 Wash.2d 645, 652, 664 P.2d 1202 (1983), the court held that because RCW 86.12.037 does not affect fundamental rights, it does not prohibit recovery under the takings provision of our state constitution, article I, section 16. Accord Halverson, 139 Wash.2d at 12, 983 P.2d 643; see also Conger, 116 Wash. at 38-40, 198 P. 377. The county disregards that portion of the opinion and argues only the facts of Paulson: that the county was found to be immune from liability for damages caused by a breach of the levy. Paulson was clearly a tort action. 99 Wash.2d at 649, 650-51, 664 P.2d 1202.
¶ 31 The same is true for Short, also relied upon by the county. In Short, the landowners alleged that because the county failed to properly repair a break in a bulkhead with cement, choosing instead to fill the hole with stakes and brush, the wall gave way and the rushing water eroded two acres of the landowners' topsoil. Short, 194 Wash. at 428-29, 78 P.2d 610. The court held that the immunity statute applied to that claim. Id. at 430, 78 P.2d 610.
¶ 32 The governmental entities also rely on Halverson, which they assert holds that tort immunity is inapplicable only when the alleged violation is solely based on constitutional grounds and the immunity applies here because the landowners have pleaded tort claims as well as constitutional claims.
¶ 33 In Halverson, the court discussed a "hybrid" tort and inverse condemnation claim. 139 Wash.2d at 11-12, 983 P.2d 643. But that was in the context of whether the county could be held' liable under the tort concept of joint and several liability. Id. at 11, 983 P.2d 643. The landowners did not introduce such a hybrid concept here.
¶ 34 The governmental entities incorrectly assert that because the landowners claim that the entities negligently constructed the dike in the wrong location, their takings action is actually a tort action, to which it is immune as in Short. The landowners' claim is for blocking a natural drainway or flood channel. Negligence is not an issue.
INVERSE CONDEMNATION
¶ 35 Article I, section 16 of the Washington Constitution prohibits the taking or damaging of private property without just compensation. The Washington Supreme Court has interpreted this provision to allow a landowner to bring an inverse condemnation action to "`recover the value of property which has been appropriated in fact, but with no formal exercise of [condemnation] power.'" Pierce v. Ne. Lake Wash. Sewer & Water Dist., 123 Wash.2d 550, 556, 870 P.2d 305 (1994) (alteration in original) (quoting Martin v. Port of Seattle, 64 Wash.2d 309, 310 n. 1, 391 P.2d 540 (1964)).
¶ 36 The elements of inverse condemnation are: "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." Phillips, 136 Wash.2d at 957, 968 P.2d 871. "The taking or damaging of property to the extent that it is reasonably necessary for the maintenance and operation of other property devoted to a public use is a taking or damaging for a public use and subject to the provisions of *723 article I, section 16, of the Washington State Constitution." Dickgieser v. State, 153 Wash.2d 530, 535, 105 P.3d 26 (2005).
¶ 37 The parties generally agree that a takings claim can lie for damages that are "necessarily incident to" or a "necessary consequence of a public project. State's Br. at 16-17; County's Br. at 25-26; Appellants' Br. at 8-11. But the government entities assert that their actions do not constitute a taking because the damage to the landowners' property was not contemplated by them and it was not "necessarily incident to" the construction of the dike. State's Br. at 16-17; County's. Br. at 22-28. A similar argument was made and rejected by this court in Lambier v. City of Kennewick, 56 Wash.App. 275, 279-80, 783 P.2d 596 (1989). Lambier held: "The unintended results of a governmental act may constitute a `taking.'" 56 Wash.App. at 281, 783 P.2d 596. But the landowners must show proximate cause between the governmental activity and the landowners' loss. Halverson, 139 Wash.2d at 12-13, 983 P.2d 643 ("`To have a taking, some governmental activity must have been the direct or proximate cause of the landowner's loss.'") (quoting Phillips, 136 Wash.2d at 966, 968 P.2d 871) (citing Lambier, 56 Wash. App. at 283 n. 4, 783 P.2d 596).
¶ 38 Liability may exist when the alleged taking or damage was caused by affirmative action of a government entity, i.e., appropriating the land, restricting its use through regulation, or causing damage by constructing a public project to achieve a public purpose. Rains v. Dep't of Fisheries, 89 Wash.2d 740, 745-47, 575 P.2d 1057 (1978). Here, the landowners assert that the government entities' affirmative action was their construction, maintenance, and modification of the dike. The state claims that it did not own, plan, construct, operate, maintain, or design the dike. The landowners presented evidence that: (1) the county received right-of-way deeds for the dike, which was used in part as a public recreation trail, in early 1990; (2) the land upon which the dike was built was deeded to the county and state sometime in the 1990s; and (3) the state and county made written agreements for the 1975 construction of the dike as well as for the improvements and modification in 1978, which would be performed by the county subject to the approval of the director of ecology; (4) the county and state were both involved in the construction and improvement of the dike, which was intended to "protect nearby properties, including Highway 20, from flood damage in high water events" (CP at 92-93); and (5) the state and county, as co-owners, applied to repair the dike.
¶ 39 The landowners properly state that they have presented genuine issues of material fact regarding the state and county's roles in the construction, improvement, and maintenance of the dike in which they had ownership interest, rendering summary judgment inappropriate on this basis.
¶ 40 The county asserts that a proximate cause of the flooding was the presence and release of an upstream logjam. This is a question for the jury. It also claims that the logjam was an "intervening natural event" that negates the claim that the avulsion of the stream and damage to the property was necessarily incident to the dike. County's Br. at 28. Because the county does not support its intervening natural event theory with authority, we will not address it. See RAP 10.3(a)(5); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
¶ 41 The landowners have presented issues of fact that preclude summary judgment on their inverse condemnation claim.
¶ 42 Reversed and remanded.
I CONCUR: SWEENEY, C.J.
BROWN, J.
¶ 43 I would affirm the summary judgment grant for Okanogan County and the State on two grounds. First, the common enemy rule applies as a defense to this flooding claim. Halverson v. Skagit County, 139 Wash.2d 1, 13-15, 983 P.2d 643 (1999). Moreover, the State lacks the necessary proprietary interest in the Sloan Witchert Slough dike to attach liability under Halverson. Even considering their inverse condemnation theory, the Fitzpatricks' proposed watercourse exception *724 to the general rule of non-liability, would effectively eliminate the common enemy rule as developed in Washington for over 100 years. Second, even if the common enemy rule did not apply, I would hold that statutory immunity applies to the County under RCW 86.12.037 and to the State under ROW 86.16.071. Accordingly, I respectfully dissent.
NOTES
[1] The state and county are referred to, collectively, in this opinion as the government entities. Other named parties were dismissed on summary judgment. The landowners' do not appeal their dismissal.
[2] The levees in Halverson "are located between 50 and 1,000 feet from the Skagit River's banks. The river waters do not come into contact with the levees until the waters leave the banks of the river channel." Halverson, 139 Wash.2d at 5, 983 P.2d 643. In this case, no assertion is made regarding the placement of the dikes in relation to the river banks.
[3] See, e.g., Wither v. W. Props., 14 Wash.App. 169, 173-74, 540 P.2d 470 (1975) (obstruction of drainage ditch caused backed-up water and flooding); Dahlgren v. Chicago, Milwaukee & Puget Sound Ry. Co., 85 Wash. 395, 406, 148 P. 567 (1915) (obstruction of watercourse caused backup flow flooding); Miller v. E. Ry. & Lumber Co., 84 Wash. 31, 33, 35-36, 146 P. 171 (1915) (obstruction of stream caused backup flow flooding plaintiff's land).