219 P.3d 730 (2009)
CITIZENS PROTECTING RESOURCES, a Washington nonprofit corporation, Appellant,
v.
YAKIMA COUNTY, a political subdivision of the state of Washington; Yakima County Flood Control Zone District, a Washington quasi municipal corporation; Quintin W. Douglas and Josephine Douglas, husband and wife, William L. Pettit and Mary Pettit, husband and wife; Douglas Towing, a Washington sole proprietorship, Douglas Wrecking, a Washington partnership, Respondents.
No. 27803-4-III.
Court of Appeals of Washington, Division 3.
November 5, 2009.
*731 James Cortland Carmody, Velikanje Halverson PC, Yakima, WA, for Appellant.
Kenneth W. Harper, Menke Jackson Beyer Ehlis & Harper LLP, David Allan Thompson, Attorney at Law, Yakima, WA, William L. Pettit (Appearing Pro Se), Mary Pettit (Appearing Pro Se), Wapato, WA, for Respondents.
KORSMO, J.
¶ 1 Citizens Protecting Resources (CPR) challenges, on several different theories, the relocation at significant expense to Yakima County of a wrecking yard from a flood-prone island to a residential neighborhood. We conclude that the relocation was authorized by the county's interest in limiting further flooding, and, thus, did not constitute a gift of public property or credit, nor was it an improper land "swap." We affirm.

FACTS
¶ 2 The procedural history of this case is extensive and involved. Douglas Wrecking consisted of a wrecking yard and towing operation located on an island in the Yakima River for 56 years. Foundations for the Donald-Wapato Bridge are set on the island.[1] The bridge contains an access ramp to the island.
¶ 3 Yakima County has suffered significant flooding over the years and has been designated as a federal disaster area four times since 1990. The major county flood in 1996 was described as "near catastrophic" in terms of damage to public and private property. The Donald-Wapato Bridge was seriously damaged in the 1996 flood. The Yakima County Flood Control Zone District (FCZD) was established on January 13, 1988, to direct flood prevention activities. The FCZD's mission was to reduce the risk of flood damage to public and private property through various means.
¶ 4 By early 2001, several projects were identified for the FCZD to work on. Relocating wrecking yards from critical hydrological areas became a major potential project. Several wrecking yards located in the flood plains of the Naches and Yakima Rivers had suffered large scale damage in the 1996 floods. A grant to study and assist in relocation of automobile recycling yards was obtained. The FCZD concluded its analysis of the flood plain wrecking yards in 2003.
*732 ¶ 5 Douglas Wrecking was selected as the pilot relocation project. Two grants contributed more than $250,000 toward the project. One grant provided $125,000 to purchase land on which to relocate the wrecking yard. The FCZD identified a location, known as the "McDonald site," for possible relocation. Over the next three years, Yakima County paid for options to purchase the property while a conditional use permit was sought to permit a wrecking yard at the location. Neighbors, many of whom later created CPR, opposed the project. The hearing examiner granted the conditional use permit on March 31, 2005, subject to 22 conditions. Most of the conditions ensured compliance with regulations and integrated the wrecking yard into the neighborhood. There was no appeal of the conditional use permit decision.
¶ 6 Two years later, on May 29, 2007, the Yakima Board of County Commissioners passed a resolution authorizing the FCZD to negotiate with Douglas for relocation. An agreement was reached. The FCZD would reimburse Douglas up to $425,000 for the relocation. A timeline and reimbursement percentages were included in the agreement. Douglas would deed the island to Yakima County after completing the move and cleaning the island. The county would deed the McDonald site to Douglas after it completed the island clean-up tasks.
¶ 7 The Yakima Board of County Commissioners exercised its option on the McDonald site on November 30, 2007, and the sale closed three days later. A total of $196,631.63 was spent acquiring the property. The sale price of $110,000 was augmented by the three options and reimbursement for removing property fixtures.
¶ 8 CPR filed suit on April 4, 2008, seeking a declaratory judgment, injunctive relief, and mandamus. CPR invited the Washington Attorney General to commence action against Yakima County and the FCZD on behalf of county taxpayers. Discerning no illegal activities, the Attorney General's Office declined to take action. A letter from the Solicitor General advised CPR that the local government actions were not contrary to law, the relocation served a fundamental government purpose, and the county received value in eliminating the risk of loss to public property.
¶ 9 CPR filed a motion for summary judgment. Yakima County and the FCZD filed a cross motion for summary judgment. The trial court issued a letter ruling outlining the decision to grant summary judgment for the FCZD and Yakima County. The court reasoned that the relocation served the fundamental government purpose of flood control, the alleged disparity in value of the properties did not show intent to benefit the towing company, the land swap statute did not apply, and that the challenge was untimely. The order granting summary judgment was entered January 16, 2009.
¶ 10 CPR timely appealed to this court.

ANALYSIS
¶ 11 This appeal presents three challenges to the relocation agreement. Appellant contends that the transaction violates the constitutional prohibition on making a gift of public property or public credit, violates the land swap statute (RCW 36.34.330), and also allege that their challenge was timely brought. These present questions of statutory or constitutional interpretation which this court reviews de novo. Cosmopolitan Eng'g Group, Inc. v. Ondeo Degremont, Inc., 159 Wash.2d 292, 298, 149 P.3d 666 (2006) ("Statutory interpretation is a question of law, subject to de novo review."); State v. Jackman, 156 Wash.2d 736, 746, 132 P.3d 136 (2006) (constitutional claim is reviewed de novo).
¶ 12 The standard of review for cases resolved on summary judgment is a matter of well-settled law. A reviewing court also considers those matters de novo, considering the same evidence presented to the trial court. Lybbert v. Grant County, 141 Wash.2d 29, 34, 1 P.3d 1124 (2000). The facts, and all reasonable inferences to be drawn from them, are viewed in the light most favorable to the nonmoving party. Id. If there is no genuine issue of material fact, summary judgment will be granted if the moving party is entitled to judgment as a matter of law. Id.
*733 ¶ 13 With these standards in mind, we will address the arguments in the order presented by the appellant.[2]
Gift of Public Funds and Credit
¶ 14 The state of Washington and its subdivisions are prohibited by the Washington Constitution from making gifts of public property to citizens. CONST. art. VIII, §§ 5, 7. The limitation on state subdivisions provides:
No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.
CONST. art. VIII, § 7.
¶ 15 The two provisions, despite some differences in wording, "have identical meaning, as well as the same prohibitions and exceptions." CLEAN v. State, 130 Wash.2d 782, 797, 928 P.2d 1054 (1996). "The manifest purpose of these provisions in the constitution is to prevent state funds from being used to benefit private interests where the public interest is not primarily served." Japan Line, Ltd. v. McCaffree, 88 Wash.2d 93, 98, 558 P.2d 211 (1977).
¶ 16 The test of whether these provisions have been violated is straightforward.
A two-pronged analysis is employed to determine whether a gift of state funds has occurred. First, the court asks if the funds are being expended to carry out a fundamental purpose of the government? If the answer to that question is yes, then no gift of public funds has been made. The second prong comes into play only when the expenditures are held to not serve fundamental purposes of government. The court then focuses on the consideration received by the public for the expenditure of public funds and the donative intent of the appropriating body in order to determine whether or not a gift has occurred.
CLEAN, 130 Wash.2d at 797-798, 928 P.2d 1054.
¶ 17 CPR argues that the transaction between the respondents was both a gift of property and an improper extension of government credit. Respondents contend that the relocation serves the public interest. We agree. Flood prevention and amelioration is a fundamental purpose of government, so there was no gift of public property or credit.
¶ 18 Appellant casts the issue as whether helping a business relocate is a fundamental government purpose and concludes, unsurprisingly, that it is not. If that were the question, we might agree. However, the entire context of these agreements shows that the government purpose here was to fight flooding on the Yakima and Naches Rivers.
¶ 19 Fighting floods has long been recognized as a proper exercise of the police power. In 1935, the Legislature declared that fighting floods was a "matter of public concern" and the State would "exercise . . . its sovereign and police powers" to assume full regulatory control over flowing waters in the state. RCW 86.16.010.[3] The courts likewise have long recognized that addressing flood problems was a proper role of state and local government. In upholding a Clark County storm water run-off ordinance, the Washington Supreme Court once noted that "measures to prevent flooding in the entire drainage basin, are well within the definition of police power as health, safety or welfare measures." Teter v. Clark County, 104 Wash.2d 227, 233, 704 P.2d 1171 (1985).[4]
*734 ¶ 20 We have no trouble agreeing that flood fighting is a fundamental purpose of government and has long been recognized as an activity within the powers of state and local government. The record reflects that the relocation of Douglas Towing was for the benefit of the public and came after a lengthy period studying the various means of fighting flood problems. Substantial evidence in the record established that emptying the island and allowing it to return to a natural state (and eventually erode) would safeguard the Donald-Wapato Bridge and ameliorate downstream flood damage. While Douglas Towing may have benefited from moving to a new facility prepared for it at public expense, that fact alone does not suggest that the purpose of the move was to benefit the company. The evidence clearly and conclusively established that the move was part of regional flood control efforts.
¶ 21 The relocation of Douglas Towing for flood control purposes served a fundamental government purpose. Accordingly, we need not further analyze the arguments concerning the alleged disparity in the costs of the relocation agreement.[5]CLEAN, 130 Wash.2d at 797-798, 928 P.2d 1054. Article VIII, section 7 of the Washington Constitution was not violated. There was no gift of public property or of public credit.

Land Swap Statute
¶ 22 RCW 36.34.330, entitled "Exchange for privately owned real property of equal value," provides:
The board of county commissioners of any county shall have authority to exchange county real property for privately owned real property of equal value whenever it is determined by a decree of the superior court in the county in which the real property is located, after publication of notice of hearing is given as fixed and directed by such court, that:
(1) The county real property proposed to be exchanged is not necessary to the future foreseeable needs of such county; and
(2) The real property to be acquired by such exchange is necessary for the future foreseeable needs of such county; and
(3) The value of the county real property to be exchanged is not more than the value of the real property to be acquired by such exchange.
¶ 23 Appellant contends that by transferring Douglas Towing's interest in the island for the improved McDonald site, respondents violated this statute because the properties were not equally valued and court approval was not obtained. The trial court found the statute inapplicable because this was not a simple land swap. Once again, we agree with the trial court.
¶ 24 There appear to be no cases construing this statute. On its face, this statute permits counties to exchange surplus real property for other real property that would be useful to the county. That is not the situation here. The county needed the McDonald property in order to facilitate moving one of the wrecking yards; it was not surplus land. The McDonald site was purchased solely for the relocation project.
¶ 25 More fundamentally, appellant's attempt to isolate one component of a complex agreement is not proper. The fundamental essence of the agreement with Douglas Towing was to relocate the business out of the flood plain as one step in controlling future flood damage. The costs of relocation, particularly site preparation, greatly exceeded the value of the underlying parcels of land that were being exchanged. The value to be realized by local government consisted of mitigated future flood damage and lower future flood-fighting costs. This was far more than a simple swap of unused surplus land and we conclude, on these facts, that RCW 36.34.330 does not apply.[6]
*735 ¶ 26 Appellant contends, bitterly at times, that Yakima County spent too much money in relocating Douglas Towing. There may have been less expensive methods of obtaining the island and relocating the business. Nonetheless, it is fundamentally a political decision for a political branch of government to weigh the expected value of this project against its cost and determine whether the action is in the public interest. CLEAN, 130 Wash.2d at 795-797, 928 P.2d 1054. The fact that a private party, Douglas Towing, might also benefit does not mean either that the public did not benefit from the agreement or that the purpose of the agreement was to benefit Douglas Towing. Id. at 796, 928 P.2d 1054 (the fact that the Seattle Mariners would benefit from a new stadium did not mean that the public would not also benefit). Whether the deal between Yakima County and Douglas Towing was a wise one was a decision for the Board of County Commissioners to make and, ultimately, one for the public to consider at election time. The obligation of this court is to consider whether our constitution and laws prohibited the agreement. We agree with the trial court that they did not.
¶ 27 The judgment is affirmed.
WE CONCUR: SCHULTHEIS, C.J., and SWEENEY, J.
NOTES
[1] Estimates of the island's size vary from 7 to 25 acres.
[2] Because we address the merits of appellant's challenges, we need not address the argument concerning the trial court's alternative holding that the challenge was also untimely.
[3] Earlier flood control legislation is discussed in Short v. Pierce County, 194 Wash. 421, 429-430, 78 P.2d 610 (1938).
[4] In an earlier case involving actions taken to fight a rampaging river, the court noted: "It is the law that, in meeting an emergency, such as fire, flood, or pestilence, public officials and private citizens may employ almost any available means in an endeavor to control the danger." Short, 194 Wash. at 432, 78 P.2d 610.
[5] Throughout its briefing, CPR erroneously compares the $800,000 total cost to Yakima County of the land acquisition, site preparation, and relocation agreement to the value of the unimproved island property it would eventually receive. In addition to comparing apples to oranges, this approach totally ignores the significant costs (approximately $160,000) incurred by Douglas Towing and the value to the county of expected lower flood damage and control costs in the future. This agreement was not as financially one-sided as appellant contends.
[6] Merely dressing up a land swap with side agreements would not take a transaction outside of this statute. Here, however, it is very clear that this is not a disguised land swap; rather, the exchange of land is one portion of a large flood-fighting campaign. Trial courts will be able to identify attempts to evade the statute.